BURKE, Judge.
Anthony Lane was convicted of murder made capital because it was committed during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975. The jury, by a vote of 10-2, recommended that Lane be sentenced to death. The trial court accepted the jury’s recommendation and sentenced Lane to death. This appeal follows.

Facts

The State’s evidence tended to show the following. At approximately 9:00 p.m., on May 22, 2009, Frank Wright’s body was found at a self-serve car wash in Birmingham. According to Officer Gregory Everett of the Birmingham Police Department, Wright’s body was lying face down inside one of the wash bays with his pockets turned out as if someone had gone through them and emptied them. Wright had sustained multiple gunshot wounds and was dead when the police arrived. A short time later, police responded to a call that a vehicle was on fire a short distance away from the car wash behind Munchies convenience store (“Munchies”). The burned vehicle was eventually determined to belong to Wright.
Officer Travis Hendrix testified that Wright’s vehicle was not severely damaged by the fire. However, Officer Hendrix stated that the vehicle was “literally ransacked.” (R. 298.) Officer Hendrix stated: “[Y]ou could tell that somebody went through it.” (R. 298.) Officer Hendrix also testified that he retrieved Wright’s wallet from the passenger-side floorboard of the vehicle. Although the wallet contained Wright’s identification, it did not contain any money.
*1086 Michael Johnson testified that he was at Munchies on the evening of May 22, 2009. Johnson stated that he saw a man, whom he identified as Lane, putting gasoline into a container outside the store. According to Johnson, Lane offered him the remainder of the gasoline that Lane had already purchased. Johnson accepted the gasoline and testified that, as Lane was walking away, Lane said “that he had to go get rid of some evidence.” (R. 391.) Johnson testified that Lane then walked behind the store. A short time later, Johnson heard a “loud boom or noise” coming from behind the store. (R. 393.)
Randy Shunnarah, the owner of Munchies, testified that he was working at his store on the evening of May 22, 2009, when he heard a “big boom go off.” (R. 413.) Shunnarah went outside to investigate the noise and, upon discovering a burning vehicle behind his store, immediately called the police. Shunnarah also testified that his store is equipped with surveillance cameras and that the cameras were in operation on May 22, 2009. Shunnarah allowed the police to have access to all the footage from the cameras. Based on that video footage, the police determined that Lane had been inside the store and had purchased a small amount of gasoline a short time before the explosion.
Lane was arrested the next morning and taken to police headquarters where he was questioned by Detectives Eric Tor-rence and Henry Lucas of the Birmingham Police Department. Before he was questioned, the detectives read Lane his Miranda[1] rights. Lane stated that he understood his rights and signed a written waiver indicating that he wished to talk to Detectives Lucas and Torrence. Detectives Lucas and Torrence then proceeded to question Lane regarding his activities on May 22, 2009. A recording of the interrogation was played for the jury at trial.
Lane initially denied any involvement in Wright’s murder and in burning Wright’s vehicle. Lane insisted that he had not been inside Munchies on May 22, 2009. However, after being shown pictures from the surveillance cameras depicting him inside the store, Lane admitted that he had been in the store that night. After further questioning, Lane admitted that he shot Wright “three or four times,” then “hopped in [Wright’s] car and sped off.” (State’s exhibit 100.) Lane also admitted that he “toss[ed] gas on [Wright’s] car” and “set it on fire.” (State’s exhibit 100.) Lane told police that he gave the murder weapon to a man that he did not know with the understanding that the man would give Lane money for the gun at a later time.
Three shell casings were recovered at the crime scene. According to Officer Perry Gordon, an expert in firearms and tool-marks examination, the caliber of the bullet recovered from Wright’s body was consistent with the shell casings recovered from the crime scene. Dr. Robert Brissie, who performed an autopsy on Wright, testified that Wright died as the result of multiple gunshot wounds.

Discussion

Lane raises several issues in his brief to this Court, some of which were not raised at trial and are consequently unpreserved for appellate review. However, because Lane was sentenced to death, his failure to object at trial does not preclude this Court from reviewing those issues for plain error. Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under re *1087 view, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
In Wilson v. State, 142 So.3d 732, 751 (Ala.Crim.App.2010) (opinion on return to remand), this Court stated:
“‘[T]he plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.”’ United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)(quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). ‘The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.’ Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999). Under the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial. See Ex parte Walker, 972 So.2d 737, 752 (Ala.2007) (recognizing that the appellant has the burden to establish prejudice relating to an issue being reviewed for plain error); Thomas v. State, 824 So.2d 1, 13 (Ala.Crim.App.1999) (recognizing that to rise to the level of plain error, an error must have affected the outcome of the trial), overruled on other grounds, Ex parte Carter, 889 So.2d 528 (Ala.2004). That is, the appellant must establish that an alleged error, [1] “ ‘not only seriously affect[ed] [the appellant’s] “substantial rights,” but ... also ha[d] an unfair prejudicial impact on the jury’s deliberations.’”’ Ex parte Brown, 11 So.3d 933, 938 (Ala.2008) (quoting Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002), quoting in turn Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). Only when an error is ‘so egregious ... that [it] seriously affects the fairness, integrity or public reputation of judicial proceedings,’ will reversal be appropriate under the plain-error doctrine. Ex parte Price, 725 So.2d 1063, 1071-72 (Ala.1998) (internal citations and quotations omitted). Although the ‘failure to object does not preclude [appellate] review in a capital case, it does weigh against any claim of prejudice.’ Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.1985) (citing Bush v. State, 431 So.2d 563, 565 (1983)) (emphasis in original). As the United States Supreme Court has noted, the appellant’s burden to establish that he is entitled to reversal based on an unpre-served error ‘is difficult, “as it should be.”’ Puckett v. United States, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009) (quoting United States v. Dominguez Benitez, 542 U.S. 74, 83, n. 9, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004)).”
With these principles in mind, we will address each of Lane’s arguments.
I.
First, Lane asserts that he is mentally retarded and therefore ineligible for the death penalty under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In Atkins, the United States Supreme Court held that the Eighth Amendment to the United States Constitution prohibits the execution of a mentally retarded offender. The trial court held a hearing on this issue after the guilt phase of Lane’s trial. However, the court ultimately found that Lane did not meet his burden of proving that he was mentally retarded.
In Morris v. State, 60 So.3d 326, 339-41 (Ala.Crim.App.2010), this Court discussed *1088 the law as it relates to capital defendants’ claims of mental retardation:
“The United States Supreme Court in Atkins provided guidelines for determining whether a person is mentally retarded to the extent that he or she should not be executed. However, the Court also held that ultimately the states should establish their own definitions. The Court stated:
“ ‘To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in Ford v. Wainwright, 477 U.S. 399 (1986), with regard to insanity, “we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.” Id., at 405, 416-417.’
“536 U.S. at 317, 122 S.Ct. at 2250. (Footnote omitted.)
“Alabama has yet to statutorily define mental retardation in the context of determining the sufficiency of an Atkins claim. However, Alabama has defined a mentally retarded person for the purposes of the ‘Retarded Defendant Act,’ § 15-24-1 et seq., Ala.Code 1975, as follows:
“ ‘Mentally retarded person. A person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments.’
“§ 15-24-2(3), Ala.Code 1975.
“The Alabama Supreme Court has directed that review of Atkins claims are to be conducted applying the ‘ “most common” or “broadest” definition of mental retardation, as represented by the clinical definitions considered in Atkins and the definitions set forth in the statutes of other states that prohibit the imposition of the death sentence when the defendant is mentally retarded. See, e.g., Ex parte Perkins, 851 So.2d 453, 455-56 (Ala.2002).’ Smith v. State, [Ms. 1060427, May 25, 2007] - So.3d -, - (Ala.2007). Moreover, in examining the definitions of mental retardation in other states with statutes prohibiting the execution of a mentally retarded person, the Alabama Supreme Court has written:
“ ‘Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).’
“Ex parte Perkins, 851 So.2d 453, 456 (Ala.2002).
“Similarly, in suggesting guidance for determining whether a defendant is mentally retarded so as to prohibit the defendant’s execution, the Atkins Court discussed clinical definitions of mental retardation and concluded that these definitions ‘require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as *1089 communication, self-care, and self-direction that became manifest before age 18.’ 536 U.S. at 318, 122 S.Ct. 2242. Further, ‘[ijmplicit in the definition is that the subaverage intellectual functioning and the deficits in adaptive behavior must be present at the time the crime was committed as well as having manifested themselves before age 18.’ Smith v. State, — So.3d at -.
“Alabama appellate courts have determined that until the Alabama Legislature establishes a definition for mental retardation to be used in determining Atkins claims, Alabama courts will continue to review such claims ‘on a case-by-case basis and to apply the guidelines that have been judicially developed thus[1] far.’ Morrow v. State, 928 So.2d 315, 324 (Ala.Crim.App.2004).”
60 So.3d at 339-40 (footnote omitted).
Lane presented two witnesses at his Atkins hearing. Brittany Brooks, Lane’s older sister, testified that, when Lane was born, his chest was caved in and his head was very large. She stated that Lane had to be flown to a different hospital in order to have fluid drained from his head. Brooks testified that Lane did not walk until he was almost three years old, that he was diagnosed with dyslexia as a child, and that he had difficulty in school. According to Brooks, Lane had never been gainfully employed, had never been able to handle his own finances, and depended on family to handle his money. Brooks also testified regarding some of Lane’s family history. She stated that their mother and brother were both murdered. Brooks also described an incident that occurred when Lane was 14 years old when his uncle hit him in the head with a shotgun causing Lane to lose consciousness. Brooks also stated that Lane used marijuana, ecstacy, and alcohol.
Dr. John Goff, a clinical neuropsychologist, testified that he met with Lane three times at the request of defense counsel. Dr. Goff administered a number of psychological assessments to Lane including the fourth edition of the Wechsler Adult Intelligence Scale.[2] Dr. Goff ultimately determined that Lane had a full-scale I.Q. of 70. Based on Dr. Goffs evaluation, the trial court found that Lane satisfied the first prong of Atkins, i.e., that Lane had significantly subaverage intellectual functioning. The State did not refute Dr. Goffs assessment of Lane’s I.Q. at trial, nor does it do so on appeal. Thus, the issue before this Court is whether the trial court abused its discretion in finding that Lane failed to prove the second prong of Atkins, i.e., that Lane had “significant or substantial deficits in adaptive behavior” that manifested before his 18th birthday.[3] See Morris v. State, 60 So.3d at 340, quoting Ex parte Perkins, 851 So.2d 453, 456 (Ala.2002).
In Smith v. State, 71 So.3d 12, 20 (Ala.Crim.App.2008), this Court noted:
“ ‘Adaptive skills are those skills that one applies to the everyday demands of independent living, such as taking care of oneself and interacting with others.’ State v. White, 118 Ohio St.3d 12, 885 *1090 N.E.2d 905, 908 (2008). The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 39 (4th ed. 2000), defines adaptive functioning as ‘how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.’ ”
In order for an individual to have “significant or substantial deficits in adaptive behavior,” he must have “concurrent deficits or impairments in present adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.” Albarran v. State, 96 So.3d 131, 197 (Ala.Crim.App.2011), quoting Ex parte Perkins, 851 So.2d at 456.
Dr. Goff testified that Lane had deficits in the following areas of adaptive functioning: communication, functional academics, self-direction, leisure activities, social skills, community use, home living, health and safety, and self-care. (C. 498.) Dr. Goff testified that Lane read at a third-grade level and had difficulty with mathematical calculations. Dr. Goff stated that Lane had never been gainfully employed; that he had to be told to wash his clothing and what clothing to wear; that he was unable to manage his money; that he had no hobbies; and that he used cocaine, ec-stacy, and alcohol. Dr. Goff stated that his findings regarding Lane’s adaptive functioning were based on interviews with Lane and members of Lane’s family. Dr. Goff testified that he was unable to obtain or review any of Lane’s school records.
Dr. Goff also testified regarding possible complications surrounding Lane’s birth. However, Dr. Goff characterized the only available medical records as “sketchy.” (R. 757.) Dr. Goff stated that the medical records he was able to review indicated that Lane was born with a chest deformity that resulted in some type of respiratory distress. According to Dr. Goff, that type of condition could have contributed to Lane’s cognitive difficulties. Dr. Goff also testified that, according to Lane’s family members, Lane was born with “fluid on the brain.” (R. 759-60.) However, there were no medical records to substantiate that claim.
On cross-examination, the State questioned Dr. Goff regarding a notebook that was discovered in Lane’s home wherein Lane had composed what appeared to be lyrics to rap music.[4] Additionally, the State played the recording of Lane’s interrogation in which Lane was able to read a Miranda waiver aloud and only required assistance with one word. However, Dr. Goff maintained that, in his opinion, Lane was functionally illiterate.
After hearing arguments from each side, the trial court found that Lane was not mentally retarded and stated the following:
“[T]he thing that troubled me, more than anything, was the lack of medical records to substantiate some of the factors that were pertinent to the deficits in the adaptive behavior prong.
“I must accept the testimony that the Defendant’s IQ level is 70. And so I find that it is right there on the borderline ....
“The third prong concerning the onset before 18, is again, one of those areas *1091 where if the Court, for example, had the records from the Florida hospital. That would, I think, be informative to the Court regarding the testimony concerning encephalitis [sic].
“But I place a lot of weight on how this crime was committed. What it took to commit the crime. The observation of the victim. The ability to wait and stalk him, basically. And the way the offense was committed. And the motive behind it. Which in my mind, was clearly to rob Mr. Wright of his money and possibly the vehicle. But I think it was robbing Mr. Wright of his money that was the main motive behind this senseless killing.
“You know, I look at the fact — and I considered Dr. Goffs testimony very important in my determination, in this case. But I am not or I do not find by the preponderance of evidence that the Defendant is mentally retarded based upon my review of the trial testimony, in this case, and of the evidence or lack of evidence that came out during the cross-examination of the [Dr. Goff].
“Although I must say that I was impressed with the direct examination of Dr. Goff and how it was presented by the defense. I thought that was an admirable job.
“I wish I could say more with what I have. But — I can say, for example, that, you know, it appears that the Defendant was functioning relatively on his own, with little day-to-day supervision. That he was able to write and read and put words together in a coherent manner, consistent with the prevailing rap tunes that are out there today in this world.
“And I am just not convinced by the preponderance of the evidence that he’s mentally retarded. And that’s my ruling on that matter.”
(R. 824-26.)
On appeal, Lane contends that the trial court’s rationale for finding that he was not mentally retarded “did not adhere to the legal standard articulated in Atkins and Perkins,” and, therefore, constitutes reversible error. (Lane’s brief, at 17.) According to Lane, there was no evidentia-ry support for the trial court’s findings that Lane functioned “relatively on his own, with little day-to-day supervision.” (Lane’s brief, at 17.) Lane also argues that there was no evidentiary support for the court’s rejection of Dr. Goffs testimony regarding Lane’s ability to read and write, for the court’s finding that Lane stalked the victim and laid in wait, and for finding that Lane’s motive was to rob the victim.
Although the State did not call any witnesses at the Atkins hearing, it did incorporate all the evidence and testimony from the guilt phase of the trial into the hearing. As noted, the State introduced the recording of Lane’s interrogation at trial. During that interview, Lane told police that, on the day of the shooting, he went to the “Avondale projects” and “chilled” with several friends from 6:30 p.m. until 10:30 p.m. Lane gave the police an address near the area where he was hanging out and stated that he did this every other day. Additionally, Lane told the police what he was wearing that day and identified the brand name of the clothing.
Lane told police that, at approximately 10:30 p.m., he borrowed a cellular telephone from an individual known as “cigarette man” in order to call his grandmother to tell her that he was on his way home. However, Lane eventually told police that he had not been in the Avondale projects the entire time and admitted that he went to Munchies, purchased gasoline, and *1092 burned Wright’s vehicle. Lane ultimately admitted to shooting Wright and disposing of the murder weapon by giving it to an unidentified person. During the interrogation, Lane did not appear to have any difficulty communicating with the detectives.
As noted, Lane’s sister, Brittany Brooks, testified regarding Lane’s problems at birth, his difficulties with school, and other matters involving his family history and his difficulties functioning in society. However, when defense counsel asked Brooks if Lane’s difficulty functioning in society was part “of his lack of adaptive skills[,]” Brooks answered: “Partially, yes. And then partially because when our mother passed, it was like he went to Never Never Land. He never came back. He’s in his own little world.” (R. 738.)
We also note that the trial court chose to give little weight to Brooks’s testimony because she failed to return to court after Lane’s behavior required the court to adjourn. The State was never able to cross-examine her. Shortly after the above-quoted testimony, Lane began having some type of behavioral disturbance. The following exchange then took place:
“[Defense counsel]: This is getting out of hand over here. [Lane] has got, literally, got snot running out of his nose. And he is about to explode.
“THE COURT: What do you suggest that we do? Do we need to just take him back to the jail?
“[Defense counsel]: I don’t know, Judge. I think that’s the better—
“THE COURT: I don’t know.
“[Defense cocounsel]: I think he’s a ticking time bomb.
“[Defense counsel]: And he’s ticking fast.
“[Defense cocounsel]: I think it’s foreseeable that he could just explode any minute.
“[Defense counsel]: The sisters have had some success in calming him down. That’s all we know of, Judge. But it’s bad. It’s the worst it’s been all this time.”
(R. 739-40.) The trial court then instructed the bailiff to take Lane back to the jail in order to “let them give him some more medicine [to] calm him down....”[5] (R. 740.) Noting Brooks’s absence the following day, the trial court stated: “Well, I’m going to b'e forced to take her testimony then with a grain of salt, since she saw fit not to show up today.” (R. 810-11.)
A trial court may consider a defendant’s statement to police in evaluating whether the defendant suffers from deficits in adaptive functioning. See Smith v. State, 71 So.3d at 20 (“[A] review of Smith’s statement to police does not indicate that Smith lacked the ability to communicate or to interact with others.”). Thus, Lane’s statement to police indicated that he was able to communicate, that he was able to care for himself, and that he had a group of friends that he “chilled” with every other day. There was also evidence, in the form of Lane’s journal, indicating that Lane wrote rap lyrics. Accordingly, there was evidence to weigh against Lane’s claim that he had deficits in communication, self-care, social skills, and leisure activities. That evidence also lends support to the trial court’s finding that Lane was able to function on his own with little supervision.
There was also evidence in the record indicating that Lane used illegal drugs. Dr. Goff testified that illegal-drug use can sometimes diminish a person’s judgment. *1093 (R. 801.) Thus, Lane’s drug use, coupled with the fact that he was 19 years old at the time of the shooting, could have weighed against Lane’s claim that he had deficits in employment, self-care, health and safety issues, self-direction, and use of community resources. As to Lane’s claimed deficits in functional academics, the trial court pointed out that there were no school records to substantiate the claims made by Lane’s family members.
Additionally, the facts that Lane attempted to burn the victim’s vehicle, that he got rid of the murder weapon, and that he initially lied to detectives during his interrogation weigh against a finding that Lane suffered from adaptive deficits. In Ferguson v. State, 13 So.3d 418, 435 (Ala. Crim.App.2008),[6] the circuit court made the following findings, among others, regarding the appellant’s Atkins claim:
“Finally, Ferguson’s post-crime actions further demonstrate that he does not possess severe deficits in adaptive functioning. Ferguson gave a statement to investigators in which he repeatedly attempted to deceive and mislead authorities as to the extent of his involvement in the murders. Ferguson admitted that he removed the seat from the victim’s boat and burned it, explaining that he was worried that he had left fingerprints on the seat. Ferguson’s actions— his destroying evidence and misleading authorities — demonstrate a high level of adaptive functioning.”
This Court found that the circuit court’s findings were supported by the record and stated that it was “clear that Ferguson d[id] not meet the most liberal definition of mental retardation adopted by the Alabama Supreme Court in Perkins.” 13 So.3d at 436.
This Court has held:
“The burden of proof for a claim that a capital defendant is mentally retarded and therefore may not constitutionally be executed is on the defendant, and he or she must prove this claim by a preponderance of the evidence. Cf. Trawick v. State, 698 So.2d 151 (Ala.Crim.App.1995) (overruling Bass v. State, 585 So.2d 225 (Ala.Crim.App.1991), to the extent it implied that the burden of proving an insanity defense was by a ‘preponderance of the evidence’ rather than by ‘clear and convincing evidence’).
“ ‘ “In the context of an Atkins claim, the defendant has the burden of proving by a preponderance of the evidence that he or she is mentally retarded.” Smith v. State, [Ms. 1060427, May 25, 2007] — So.3d [—] at - [(Ala.2007)]; see Smith v. State, [Ms. CR-97-1258, Jan. 16, 2009] — So.3d - at - (Ala.Crim.App.2007) (opinion on return to fourth remand). “ ‘The question of [whether a capital defendant is mentally retarded] is a factual one, and as such, it is the function of the factfin-der, not this Court, to determine the weight that should be accorded to expert testimony of that issue.’” Smith v. State, [Ms. CR-97-1258, Jan. 16, 2009] — So.3d at - (quoting Atkins v. Commonwealth, [266 Va. 73,] 581 S.E.2d 514, 515 (2003)). As the Alabama Supreme Court has explained, questions regarding weight and credibility determinations are better left to the circuit courts, “which [have] the opportunity to personally observe the witnesses and assess their *1094 credibility.” Smith v. State, [Ms. 1060427, May 25, 2007] — So.3d at - (quoting Smith v. State, [Ms. CR-97-1258, Sept. 29, 2006] — So.3d -, - (Ala.Crim.App.2006) (Shaw, J., dissenting) (opinion on return to third remand)).’
“Byrd v. State, 78 So.3d [445] at 450 [(Ala.Crim.App.2009)]....
“Moreover, if [a defendant] fails to prove even one of the three prongs of the Atkins test by a preponderance of the evidence, he has not satisfied his burden of proof. Smith v. State, [Ms. 1060427, May 25, 2007] - So.3d at -(‘All three factors must be met in order for a person to be classified as mentally retarded for purposes of an Atkins claim.’).”
Morris v. State, 60 So.3d at 340-41.
Additionally, a circuit court’s decision regarding whether a defendant is mentally retarded under Atkins is reviewed under an abuse-of-discretion standard. See Albarran v. State, 96 So.3d 131, 198 (Ala.Crim.App.2011). “A judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based his decision.” Hodges v. State, 926 So.2d 1060, 1072 (Ala.Crim.App.2005)(internal citations omitted).
“[A]lthough it is true that as a threshold matter, the psychological evaluator must determine that the defendant was deficient in at least two areas of adaptive behavior, these shortcomings are not evaluated in a vacuum.... Even where there are indications of shortfalls in adaptive behavior, other relevant evidence may weigh against an overall finding of deficiency in this area.” Smith v. State, 112 So.3d 1108, 1133 (Ala.Crim.App.2012), citing Lewis v. State, 889 So.2d 623, 698 (Ala.Crim.App.2003).
In the present case, the trial court was in the best position to weigh all the relevant evidence, including Dr. Goffs testimony, to determine whether Lane met his burden of proof. As noted, the record supports the trial court’s finding that Lane did not have “significant or substantial deficits in adaptive behavior.” Ex parte Perkins, 851 So.2d at 456. The evidence from the trial as well as the recording of Lane’s interrogation support the trial court’s conclusions. Therefore, we hold that the trial court did not abuse its discretion when it determined that Lane was not mentally retarded. Accordingly, Lane is not entitled to relief on this issue.
II.
Next, Lane argues that the trial court denied his right to due process when it refused to allow him to present certain evidence during the guilt phase of his trial. First, Lane claims that the trial court erred when it refused to allow him to present a mental-defect defense. Second, Lane argues that the court erred by preventing him from offering evidence of low intellectual functioning, which, according to Lane, would have been offered to show that he lacked the requisite intent for capital murder. We will address each of these issues separately.
A.
During voir dire, the State objected when defense counsel began to discuss the issue of Lane’s allegedly being not guilty by reason of mental disease or defect. Outside the presence of the jury, the State asserted that it was not given notice that Lane intended to pursue an insanity defense. Lane argued that his plea was sufficient to put the State on notice; however, the trial court held that Lane was required to provide some sort of written *1095 notice of his intent to pursue that line of defense. Accordingly, the trial court held that Lane would not be allowed to pursue an insanity defense.
On appeal, Lane argues that, under Alabama law, an oral plea of not guilty by reason of mental disease or defect was sufficient to put the State on notice of his intent to pursue an insanity defense. Therefore, he says, the trial court precluded him from presenting an insanity defense based on an erroneous interpretation of the law, i.e., that he was required to provide written notice. However, Lane’s entire argument is based on the false premise that he entered a plea of not guilty by reason of mental disease or defect.
Rule 14.2(e), Ala. R.Crim. P., provides that a defendant may enter the following pleas: guilty; not guilty; not guilty by reason of mental disease or defect; or not guilty and not guilty by reason of mental disease of defect. On September 30, 2009, the trial court arraigned Lane, after which he pleaded “not guilty and not guilty by reason of mental disease or defect.” (Rl. 4.)[7] Lane’s attorney indicated that Lane had a prior diagnosis of schizophrenia. However, when the trial court learned that Lane’s youthful-offender application was pending, it set aside the plea and scheduled a hearing on Lane’s youthful-offender application for November 23, 2009. (Rl. 6-7.)
At the youthful-offender hearing, the trial court denied Lane’s youthful-offender application and arraigned him a second time. (R2. 7-8.)[8] After the court read the indictment, Lane entered the following plea: “Not guilty, Judge.” (R2. 9.) The trial court stated: “All right. A plea of not guilty will be entered on behalf of the defendant.” (R2. 9.) No mention was made of a plea of not guilty by reason of mental disease or defect. Therefore, the question whether an oral plea of not guilty by reason of mental disease or defect is sufficient to put the State on notice is immaterial because, at the time Lane went to trial, his plea was not guilty.
Lane also asserts that the State had notice of his intent to pursue an insanity defense based on a motion to continue that he filed on August 17, 2010. In that motion, Lane referenced “an expert in this cause on both insanity and mitigation.” (C. 205.) However, Lane does not cite, nor is this Court aware of, any authority for the proposition that the bare mention of an insanity expert in a motion to continue is equivalent to entering a plea of not guilty by reason of mental disease or defect. The plea entered at Lane’s first arraignment was set aside, and the State was justified in its reliance on the plea Lane entered at his second arraignment. Because Lane entered a plea of not guilty, the trial court did not err by refusing to allow him to pursue an insanity defense at trial.
B.
After the trial court held that Lane could not proceed with an insanity defense, the State made a motion in limine to prevent Lane from mentioning his alleged mental retardation during the guilt phase of the trial. On appeal, Lane argues that he was entitled to present evidence of his alleged mental retardation in order to rebut the State’s evidence indicating that Lane possessed the requisite mens rea, *1096 i.e., that Lane’s conduct was intentional. However, Lane did not object to the State’s motion in limine at trial. Therefore, we will determine only whether the trial court’s ruling constituted plain error. See Rule 45A, Ala. R.App. P.
Section 13A-3-1(a), Ala.Code 1975, defines the affirmative defense of not guilty by reason of mental disease or defect. That section goes on to declare that “[mjental disease or defect does not otherwise constitute a defense” to a prosecution for a crime. § 13A-3-1(a), Ala.Code 1975. Thus, Alabama has expressly rejected the doctrine of a defense based on diminished capacity. See Jones v. State, 946 So.2d 903, 927 (Ala.Crim.App.2006), quoting Williams v. State, 710 So.2d 1276, 1309 (Ala.Crim.App.1996). This Court has also held that “[t]he express repudiation of the diminished capacity doctrine [in] § 13A-3-1 does not render that statute unconstitutional.” Id.
Lane cites Clark v. Arizona, 548 U.S. 735, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006), for the proposition that a defendant is constitutionally entitled to present evidence of mental incapacity in order to rebut the State’s evidence indicating that a defendant possessed the requisite mens rea. Lane argues that, under Clark, the trial court was constitutionally required to allow him to present evidence of diminished capacity despite the Alabama Legislature’s repudiation of that doctrine. However, the holding in Clark does not create any such requirement.
In Clark, the defendant pleaded the affirmative defense of insanity and sought to introduce evidence of his mental condition for two reasons: first, to prove his affirmative defense, and, second, to rebut the prosecution’s evidence indicating that he possessed the requisite mens rea. The trial court allowed the defendant to present evidence of his mental condition but ruled that he “could not rely on evidence bearing on insanity to dispute the mens rea." Id. at 745, 126 S.Ct. 2709. Clark argued that such a restriction violated his right to due process. However, the United States Supreme Court held:
“The mental-disease and capacity evidence is thus being channeled or restricted to one issue and given effect only if the defendant carries the burden to convince the factfinder of insanity; the evidence is not being excluded entirely, and the question is whether reasons for requiring it to be channeled and restricted are good enough to satisfy the standard of fundamental fairness that due process requires. We think they are.”
Id. at 770-71.
In his brief, Lane argues that “[t]he United States Supreme Court held that as long as ‘the evidence is not being excluded entirely,’ a state could choose to channel this evidence under the standards governing an insanity defense.” (Lane’s brief, at 28), quoting Clark, 548 U.S. at 770. According to Lane, Clark stands for the proposition that mental-health evidence is relevant at the guilt phase and cannot be totally precluded. Thus, Lane is arguing that, under Clark, a defendant has a constitutional right to present evidence of diminished capacity notwithstanding a state’s choice to prohibit such a defense. We disagree.
In the same paragraph Lane quotes from Clark, the Supreme Court noted:
“[T]he right to introduce relevant evidence can be curtailed if there is a good reason for doing that. “While the Constitution ... prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to *1097 exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.’ Holmes v. South Carolina, 547 U.S. 319, 326 (2006); see Crane v. Kentucky, 476 U.S. 683, 689-690 (1986)(permitting exclusion of evidence that ‘poses an undue risk of “harassment, prejudice, [or] confusion of the issues”’ (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986))); see also [Montana v.] Egelhoff, 518 U.S. 37 [(1996)]; Chambers v. Mississippi, 410 U.S. 284, 302 (1973). And if evidence may be kept out entirely, its consideration may be subject to limitation, which Arizona claims the power to impose here. State law says that evidence of mental disease and incapacity may be introduced and considered, and if sufficiently forceful to satisfy the defendant’s burden of proof under the insanity rule it will displace the presumption of sanity and excuse from criminal responsibility. But mental-disease and capacity evidence may be considered only for its bearing on the insanity defense, and it will avail a defendant only if it is persuasive enough to satisfy the defendant’s burden as defined by the terms of that defense.”
Clark, 548 U.S. at 770. Thus, Clark does not stand for the proposition that a defendant is constitutionally entitled to present evidence of diminished capacity. Rather, the holding in Clark is that a state may allow a defendant to present evidence of a mental defect but that the state may also restrict the consideration of that evidence to a particular issue. Clark does not mandate that such evidence is always admissible.
Lane’s case is distinguishable from Clark because the defendant in Clark actually pleaded the affirmative defense of insanity. As discussed in the previous subsection, Lane did not. Had Lane entered a plea of not guilty by reason of mental disease or defect, then he would have been entitled to present evidence of mental retardation in order to prove that affirmative defense. Lane cites several cases in his brief supporting his contention that evidence of mental retardation can be offered to prove that a defendant suffered from a mental disease or defect. See Perkins v. State, 897 So.2d 457 (Ala.Crim.App.2004); West v. State, 586 So.2d 999 (Ala.Crim.App.1991); and Turner v. State, 521 So.2d 93 (Ala.Crim.App.1987). However, in each of those cases, the defendant entered a plea of not guilty by reason of mental disease or defect.
We note that, even if Lane had entered a plea of not guilty by reason of mental disease or defect, the trial court could have restricted the jury’s consideration of Lane’s mental-retardation evidence to the issue whether Lane was “was unable to appreciate the nature and quality or wrongfulness of his acts.” § 13A-3-l(a), Ala.Code 1975. Because Lane did not plead not guilty by reason of mental disease or defect, there was no other purpose to be served by allowing testimony regarding Lane’s mental retardation during the guilt phase.
Lane also cites a dissenting opinion in Morris v. State, 956 So.2d 431 (Ala.Crim.App.2005), in support of his contention that he was entitled to offer evidence of his mental retardation to negate the intent element of capital murder. In Morris, this Court reversed the defendant’s convictions and remanded the case for further proceedings because the trial court had refused the defendant’s request for funds to *1098 hire an independent mental-health expert to assist with his defense.
In order to make his argument, Lane quotes a portion of a sentence from the dissent out of context. In his brief, Lane states: “As recognized by the dissent, the Morris majority holding ‘implies that it believes mental retardation may be a defense to a crime,’ either as evidence supporting an insanity defense or as evidence that could rebut the State’s proof of specific intent.” (Lane’s brief, at 28), quoting Morris, 956 So.2d at 454 (Shaw, J., dissenting). However, Lane did not quote the entire sentence, which states:
“The majority does not address these questions; although the majority’s holding implies that it believes mental retardation may be a defense to a crime, it does not state whether it believes mental retardation is a complete defense because it is a mental disease or defect under § 13A-3-1, or whether it believes mental retardation, despite Alabama’s express repudiation of the diminished-capacity defense, should, or even can, negate specific intent, as intoxication may in some circumstances.”
Id. (emphasis added). Thus, Lane’s characterization is somewhat misleading. Nevertheless, the majority holding in Morris did nothing to change the fact that Alabama does not recognize a diminished-capacity defense.
Accordingly, the trial court committed no error, plain or otherwise, in preventing Lane from offering evidence of mental retardation during the guilt phase of his trial for the purpose of rebutting the State’s proof of intent. Lane is due no relief on appeal as to this issue.
III.
Next, Lane contends that the trial court erred by admitting State’s exhibit 96, a notebook containing lyrics to rap music composed by Lane as well as some of Lane’s drawings.[9] Some of the lyrics in the notebook were violent in nature and referred to guns as well as murder. A drawing in the notebook depicted a six-point star with the words “Money,” “Mac-kin,” and “Murder,” written underneath it. (State’s exhibit 96.) Some of the entries were dated between January 2007 and November 2007; other entries were not dated.
Lane filed a motion in limine in which he sought to exclude the notebook because, he said, it was irrelevant to the alleged crime. Lane also argued that, because Wright was killed in May 2009, the entries in the notebook were too remote to have any probative value and would only serve to inflame the jury.
At trial, the State offered the notebook for the purpose of proving Lane’s motive and intent. (R. 461, 463-65.) Lane again argued that the notebook was irrelevant and too remote to have any probative value. Specifically, Lane argued that the entries in the notebook did not reference “any specific intent of this — planning this crime.... ” (R. 467.) Further, he contended that the notebook was inadmissible under Rule 403, Ala. R. Evid., because, he asserted, its probative value was outweighed by the prejudicial impact it would likely have on the jury. When the notebook was admitted, Lane’s counsel stated: “Judge, at this time, we would renew our objection to the journal, as far as relevan *1099 cy and remote[ness](R. 535.) Lane did not counter the State’s argument that the notebook was being offered only to prove motive and intent, nor did he argue that it constituted improper character evidence.
A.
On appeal, Lane argues that the notebook was irrelevant and therefore inadmissible under Rule 402, Ala. R. Evid. Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Rule 401, Ala. R. Evid. Rule 402, Ala. R. Evid., provides:
“All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible.”
Lane argues that the journal is irrelevant because, he says, it “had no logical connection to the allegations against Mr. Lane” nor did it “reference the victim, the location of the crime, or any other specific fact in this case.” (Lane’s brief, at 29.)
In Grayson v. State, 824 So.2d 804 (Ala.Crim.App.1999), the defendant, who was charged with capital murder, sought to exclude evidence indicating that he possessed books and drawings that were characterized as satanic because, he argued, such evidence was irrelevant to the crime he was charged with. The challenged evidence in Grayson included drawings of a pentagram and a devil’s head; a diary kept by the defendant; and a book that recounted the history of witches.
In holding that the evidence was admissible, this Court stated that “the evidence concerning the appellant’s interest in satanism was admissible as relevant to show the motive for. this brutal and senseless killing.” Id. at 821. Furthermore, this Court discussed relevance as follows:
“‘“Evidence is relevant if it has ‘any tendency to throw light upon the matter in issue, even though such light may be weak and falls short of demonstration.’ McCain v. State, 46 Ala.App. 627, 247 So.2d 383 (1971); Austin v. State, 434 So.2d 289 (Ala.Cr.App.1983). ‘Any fact which has causal connection or logical relation to another fact, so as to make the other fact either more or less probable, is competent or relevant.’ Hurst v. State, 397 So.2d 203 (Ala.Cr.App.), cert. denied, 397 So.2d 208 (Ala.1981); Waters v. State, 357 So.2d 368 (Ala.Cr.App.), cert. denied, 357 So.2d 373 (Ala.1978).”
“‘Mitchell v. State, 473 So.2d 591, 594 (Ala.Cr.App.1985). “Evidence ... is relevant and admissible ‘if it has any probative value, however slight, upon a matter in the case.’ C. Gamble, McElroy’s Alabama Evidence § 21.01(1) (4th ed. 1991).” Leitner v. State, 631 So.2d 273, 278 (Ala.Cr.App.1993).’”
Grayson, 824 So.2d at 820-21, quoting Oddo v. State, 675 So.2d 58, 62 (Ala.Crim.App.1995).
In reaching the conclusion that the evidence in Grayson was relevant, this Court quoted Echols v. State, 326 Ark. 917, 957, 936 S.W.2d 509, 528-29 (1996), which held:
“ ‘We have said that when the purpose of evidence is to show motive, anything and everything that might have influenced the commission of the act may, as a rule, be shown. The State is entitled to produce evidence showing circumstances which explain the act, show a motive for killing, or illustrate the accused’s state of mind. Further, a trial court’s ruling on relevancy, as well as *1100 prejudicial impact, is afforded great deference by review in court and will not be disturbed absent an abuse of discretion.’ ”
824 So.2d at 820.
We likewise hold that the notebook in the present case met the definition of relevant evidence under Rule 401, Ala. R. Evid. As Lane noted in his brief, the State referenced specific excerpts from the notebook during the trial, including the following: [10]
“Maybe life wouldn’t be just a pain in the ass, if all the murders and homicides would come so fast. If life is a gun. And there’s a bitch in the path. Bullets come slip in you deep while I sit back and laugh.
[[Image here]]
“I step in the sun, I’m grab my K AR15 cock back in a spray, u loading up 9s we Loading up Ks, we gunin u Down we Don’t even play.
[[Image here]]
“Young Dale killa Im da Bosman young killa Blood spill ya young nigga coming hard up on ya niggas Brains leek out nigga
[[Image here]]
“Call me Dblock mama, cuz it just have Begun, all the robin, all the sea-min, always Buying a gun....”
(Lane’s brief, at 30-31), quoting (R. 684, 685, 461).
As part of the State’s burden of proof, it had to prove that Lane murdered Wright. Under Alabama’s capital-murder statute, “the terms ‘murder’ and ‘murder by the defendant’ ... mean murder as defined in Section 13A-6-2(a)(1)[, Ala.Code 1975]....” § 13A-5-40(b), Ala.Code 1975. Section 13A-6-2(a)(1), Ala.Code 1975, provides that a person commits the crime of murder if, “[w]ith intent to cause the death of another person, he or she causes the death of another person.” Thus, the State was required to prove intent.
The fact that Lane composed violent rap lyrics in which he described himself laughing as bullets are hitting someone and being a “young killa” does not affirmatively prove that he intended to murder anyone. However, to be relevant, evidence need only have a “tendency to throw light upon the matter in issue, even though such light may be weak and falls short of demonstration.” Grayson, 824 So.2d at 820-21. The fact that Lane wrote such lyrics makes it. more likely, though not certain, that he held such violent behavior in high esteem. The fact that Lane valued that type of behavior is probative of both his motive and intent in shooting Wright and stealing his vehicle. Thus, the contents of Lane’s notebook were relevant under Rule 401, Ala. R. Evid., and were admissible under Rule 402, Ala. R. Evid.
Additionally, the State had to prove that Lane murdered Wright during the course of a robbery. Lane’s defense centered around his contention that he never intended to rob Wright and that the taking of Wright’s vehicle was a mere afterthought. Defense counsel stated the following during opening statements:
“We expect the evidence to show, and in fact, we’ve already admitted to y’all, [Lane] shot Frank Wright. In probably one of the most senseless killings in my 34 years of trial experience. And I’m not going to offer any justification for that, because there isn’t any.
“What we will tell you is that there was no robbery. We can tell you further, that in spite of the senselessness of this killing. It’s not a Capital Murder case. It’s a murder case.
*1101 “I’ve been honest with you from the start.
“Not trying to justify it. Not trying to explain it away. Not trying to fib to you or trick you. I’m telling you this was not done in the course of a robbery.”
(R. 270-71.) Thus, the fact that Lane wrote about robbing people served to rebut Lane’s defense, i.e., that the robbery was an afterthought. Accordingly, the notebook was relevant under Rule 401, Ala. R. Evid., and therefore admissible under Rule 402, Ala. R. Evid.
 Lane also argues that the notebook was irrelevant because of its remoteness in time to the murder. As noted, the entries in the notebook were dated between January 2007 and November 2007; Wright was shot on May 22, 2009. However, in Siler v. State, 705 So.2d 552, 557 (Ala.Crim.App.1997), this Court noted that “[t]he remoteness of a collateral act goes to the weight of the evidence rather than its admissibility.” Furthermore, “[i]f the evidence is not so remote as to lose its relevancy, the decision to allow or not allow evidence of collateral crimes or acts as part of the State’s case-in-chief rests in the sound discretion of the trial judge.” Id. at 557, quoting Cooley v. State, 686 So.2d 546, 550 (Ala.Cr.App.1996) (internal citations and quotation marks omitted).
In the present case, the entries in Lane’s notebook were written less than three years before the murder. We do not find that the trial court abused its discretion by not finding that the notebook was so remote as to be irrelevant. We also note that several of the entries were not dated. Thus, it is unclear when those entries were written.
Finally, Lane argues that the notebook should have been excluded under Rule 403, Ala. R. Evid., which provides:
“Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”
Lane argued that the probative value of the notebook was substantially outweighed by the danger of unfair prejudice. In Grayson, this Court found that the probative value of the evidence concerning the defendant’s interest in satanism “outweighed its potential prejudicial effects.” 824 So.2d at 821. The Court went on to explain that,
“ ““ “[prejudicial” is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.’ [Citation omitted.] ‘Of course, “prejudice, in this context, means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, but not always, an emotional one.”’” Averette v. State, [469 So.2d 1371, 1374 (Ala.Cr.App.1985).]’
“Robinson v. State, 528 So.2d 343, 347 (Ala.Cr.App.1986) (emphasis in original). See also Campbell v. State, [718 So.2d 123, 128 (Ala.Crim.App.1997). Thus, in State v. Waterhouse, 513 A.2d 862, 864-65 (Me.1986), the Supreme Court of Maine determined that evidence of satanism and the defendant’s belief therein was relevant toward proving his intent as well as being probative of motive. The Court then undertook the balancing of the probative value of this evidence *1102 against the danger of its unfair prejudice to the defendant. The Court stated:
“‘We acknowledge that evidence of defendant’s Satanic beliefs carried with it the potential for creating unfair prejudice. Nevertheless, the evidence was relevant and probative on the issues of both motive and intent, and since the challenge to this evidence is based on Rule 403 [M.R. Evid.,] for error at all to exist that probative value must be substantially overbalanced by the danger of unfair prejudice. Weighing these factors, we conclude that the admission of evidence regarding Satanism was not so highly prejudicial, nor did it so taint defendant’s trial, as to amount to obvious error.’
“Id., at 865.”
824 So.2d at 821-22.
As noted, the fact that Lane composed and had an interest in violent rap music was probative of both motive and intent. We also acknowledge that such violent lyrics may have had some prejudicial impact on the minds of the jurors. Our task is to determine whether that prejudicial impact substantially outweighed the probative value so as to move the jury to decide on an improper basis. We hold that the potential prejudicial impact of the notebook did not substantially outweigh its probative value.
The notebook in the present case is similar to the challenged evidence from Grayson. None of the evidence in Grayson specifically referenced the victim, the location of the crime, or any specific fact of the case. Nevertheless, this Court determined that its probative value “outweighed its potential prejudicial effects.” 824 So.2d at 821.
Lane attempts to distinguish Grayson by arguing that “the books and drawings about Satanism were deemed relevant to the defendant’s motive because the crime itself reflected brutality and torture associated with satanic rituals.... ” (Lane’s reply brief, at 14.) However, the facts in the present case indicate that Lane walked up to Wright, a man he had never met, pulled out a gun, shot him three times, and then drove away in his vehicle. We find that the lyrics and drawings in Lane’s notebook reflect the brutal and senseless nature of this crime. Accordingly, we hold that the probative value of the notebook was not substantially outweighed by its potential prejudicial effects.
“Whether to admit evidence based on its relevance is a question within the sound discretion of the trial court, and its decision will not be overturned on appeal aN sent an indication that it has exceeded its discretion.” Rule 402, Ala. R. Evid. Because the record supports the trial court’s ruling that the notebook was admissible under Rules 402 and 403, Ala. R. Evid., we do not find that it abused its discretion. Accordingly, the notebook was properly admitted into evidence.
B.
Lane also argues that the trial court should have precluded admission of the notebook under Rule 404(a), Ala. R. Evid., because, he says, it “was used solely to prove character and ‘action in conformity therewith....’” (Lane’s brief, at 34.) Lane did not raise an objection based on Rule 404 at the time the notebook was admitted or at any other point during the trial. “ ‘The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.’” Ex parte Coulliette, 857 So.2d 793, 794-95 (Ala.2003), quoting Ex parte Frith, 526 So.2d 880, 882 (Ala.1987). Therefore, we *1103 will only review this issue for plain error. See Rule 45A, Ala. R.App. P.
1.
Rule 404(a), Ala. R. Evid., provides that “[evidence of a person’s character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion ....”[11] However, Rule 404(b), Ala. R. Evid., provides:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....”
As noted, one of the purposes for which the State offered the notebook was to prove intent. Specifically, the State sought to prove that Lane intended to rob Wright on the night in question.
“For collateral-act evidence to be admissible for one of the ‘other purposes’ in Rule 404(b), there must be ‘ “a real and open issue as to one or more of those ‘other purposes.’”’” Draper v. State, 886 So.2d 105, 117 (Ala.Crim.App.2002)(quoting Gillespie v. State, 549 So.2d 640, 645 (Ala.Crim.App.1989), quoting in turn Bowden v. State, 538 So.2d 1226, 1227 (Ala.1988)). As discussed in the previous subsection, Lane’s trial strategy centered around his contention that robbery was never his intention and that taking Wright’s vehicle was a mere afterthought done in a moment of panic. Thus, Lane created a “real and open issue” as to intent, and it was the State’s burden to prove that Lane intended to rob the victim. Accordingly, there was no error, plain or otherwise, in the trial court’s admission of the notebook for the purpose of proving intent.
2.
Lane also argues that the State referenced the notebook as improper character evidence during its closing argument. Lane points to various portions of the State’s closing argument in which it referenced the notebook. As noted, Lane did not object to the State’s remarks during its closing argument. Therefore, we will only address whether the remarks made during the State’s closing argument constituted plain error. See Rule 45A, Ala. R.App. P.
Lane argues that the following remarks, which were made by the State during closing arguments, violated Rule 404, Ala. R. Evid.: “[C]an [the notebook] tell us what [Lane] intended? But more than that. Can it tell us who he is? (Nodding head affirmatively.) Yes. Yes it can.” (R. 683.) Lane also noted an excerpt in which the prosecutor stated that the notebook revealed Lane’s heart. Finally, Lane took issue with the following remark: “ ‘[S]ee him for who he is.... And [ ] find him guilty of capital murder.’ ” (Lane’s brief, at 34), quoting (R. 688-89.) Lane argues that the State had no basis to suggest that the lyrics he wrote reflected his heart. Further, he contends that the State’s argument fails to recognize the context of rap lyrics.
For the reasons stated previously, the trial court did not err by admitting the notebook into evidence. Lane appears to suggest that the trial court should have precluded the State from referencing the *1104 notebook during the State’s closing argument. However, the notebook had already been admitted and the State was free to reference it. Lane’s argument is essentially that the prosecutor’s remarks constituted improper argument.
This Court has held that statements made by a prosecutor in closing argument are not improper if they represent the prosecutor’s “inferences and conclusions drawn from the evidence which had been presented at trial.” Madison v. State, 718 So.2d 90, 99 (Ala.Crim.App.1997). “[T]he rules governing a counsel’s inferences from the evidence are to be liberally construed, and ... control of closing argument rests in the broad discretion of the trial court.” Id., citing Sanders v. State, 423 So.2d 348 (Ala.Crim.App.1982). In the present case, the prosecutor’s comments during closing argument were not evidence. Rather, the remarks merely expressed the prosecutor’s opinion about the meaning of the lyrics in Lane’s notebook.
Furthermore, “ ‘[t]his court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’” Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985). Viewed in the context of all the evidence presented at trial, as well as in the context of the entirety of the State’s closing argument, we do not find that the prosecutor’s remarks constituted plain error, i.e., that the remarks injuriously affected Lane’s substantial rights or otherwise caused a miscarriage of justice. See Rule 45A, Ala. R.App. P.; Wilson v. State, supra.

IV.

Next, Lane argues that the trial court gave improper and incomplete jury instructions before the guilt-phase deliberations. Specifically, Lane claims that the trial court’s capital-murder instruction failed to inform the jury that the intent to rob must coexist with the intent to murder, that the trial court’s answer to a jury question misstated the law, and that the trial court erred by failing to charge the jury on robbery. However, Lane did not request that the trial court charge the jury on robbery, nor did he object to any of the court’s instructions. At the conclusion of the charge conference, the trial court stated: “All right. So we’ll charge on Capital Murder, murder and not guilty,” to which defense counsel replied, “Yes, sir.” (R. 623-24.) At the conclusion of the jury instructions, defense counsel indicated that they were satisfied with the instructions. (R. 704.) Accordingly, these issues were not properly preserved and will only be reviewed for plain error. See Rule 45A, Ala. R.App. P.
In Belisle v. State, 11 So.3d 256, 308 (Ala.Crim.App.2007), this Court discussed plain-error review as it applies to challenged jury instructions:
“‘“‘In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that “an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.” Williams v. State, 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff‘d, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).’”
*1105 “‘Broadnax v. State, 825 So.2d 134, 196 (Ala.Crim.App.2000), quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim.App.1998). Moreover, “[w]hen reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999).” Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000).’
“Snyder v. State, 893 So.2d 488, 548 (Ala.Crim.App.2003). ‘The absence of an objection in a ease involving the death penalty does not preclude review of the issue; however, the defendant’s failure to object does weigh against his claim of prejudice.’ Ex parte Boyd, 715 So.2d 852, 855 (Ala.1998).”
With these principles in mind, we will now review Lane’s claims regarding the trial court’s jury instructions.
A.
Lane first argues that the trial court’s capital-murder instruction failed to inform the jury that the intent to rob and the intent to kill must coexist. As noted previously, Lane’s defense centered on his contention that the robbery was a mere afterthought, i.e., that he did not form the intent to rob Wright until after he shot him. However, a review of the record reveals that the trial court’s jury instructions were adequate.
In charging the jury on capital murder, the trial court stated, in pertinent part:
“The law states that an intentional murder[J [committed during a robbery in the first-degree, is Capital Murder. So an intentional murder during a robbery in the first degree is Capital Murder.”
(R. 627) (emphasis added). The trial court then gave the jury a more detailed definition of both murder and robbery. Within those instructions, the court stated that Lane must have had the “[s]pecific intent to kill the deceased” (R. 630), and that Lane must have acted with intent when he committed the robbery. Next, the trial court again instructed the jury that “[t]he sixth and last element of the Capital Murder charge is that the murder took place during the robbery.” (R. 631)(emphasis added). Finally, the trial court gave the following definition for the word “during”:
“So you heard me use the word ‘during,’ when I was talking about during the course of the robbery. During means in the course of the commission of the robbery or in connection with the commission of the robbery. Or it could be in immediate flight after the commission of the robbery. Any of those things suffices for ‘during.’ ”
(R. 633.)
Additionally, the jury asked a question regarding this issue during its deliberation. In a note to the trial court, the jury asked: “Does the sequence of events make a difference? You have defined Capital Murder as the murder occurring during the course of the robbery. Is it still Capital Murder if the murder comes first and the robbery occurs after the murder?” (C. 492.) The trial court conferred with counsel, and it was agreed that the court would “redefine what ‘during’ means.” (R. 712.) The court then gave the following instruction:
“But, if I understand what you are asking me here, you’re really asking me what the term ‘during’ encompasses.
“Because the sixth element of Capital Murder is, that the murder took place during the robbery.
“Am I right about that?
“(Jurors nodding their heads.)
“THE COURT: Is that correct?
*1106 “Okay.
“So that the murder took place during the robbery.
“So when I defined what during encompasses for you, I told you that ‘during’ means in the course of the commission of the robbery.
“Or in connection with the commission of the robbery.
“Or in immediate flight from the commission of the robbery.
“So that’s a very broad definition.
“So during means, basically, anytime during the commission of the robbery— And I’m trying not to say too much, ladies and gentlemen.
“But that ought to be clear.
“Is it?
“A JUROR: Yes, sir.
“THE COURT: Okay.”
(R. 714-15.) No objections were raised regarding the trial court’s answer to the jury’s question.
This Court has held:
“‘A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case. Roper v. State, 584 So.2d 544 (Ala.Cr.App.1991). A trial court’s oral charge to the jury must be construed as a whole, and must be given a reasonable — not a strained — construction. King v. State, 595 So.2d 539 (Ala.Cr.App.1991); Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App.1984).’”
Sneed v. State, 1 So.3d 104, 123 (Ala.Crim.App.2007), quoting Williams v. State, 710 So.2d 1276, 1305 (Ala.Crim.App.1996), aff’d, 710 So.2d 1350 (Ala.1997). Additionally, in Thompson v. State, 153 So.3d 84, 155 (Ala.Crim.App.2012), this Court held that a trial court does not commit plain error by “failing to use the term ‘mere afterthought’ in its instructions on the commission of the accompanying felony.” Like the jury instructions in the present case, the trial court in Thompson “charged the jury that the felony had to be committed during the course of the murder and that [the defendant] had to have both the specific intent to kill and the intent to commit the underlying felony.” Id. at 154.
The jury instructions in the present case, including the trial court’s answer to the jury’s question, accurately and adequately reflected the law, i.e., that the murder must take place during the robbery. We do not find that there is a “reasonable likelihood that the jury applied the instructions in an improper manner.” See Belisle, supra. To find otherwise would require a strained interpretation of the trial court’s instructions. Accordingly, we find no plain error in the trial court’s capital-murder instruction.
B.
Lane raises an additional argument regarding the trial court’s answer to the jury’s question. Lane argues that the trial court misstated the law when it redefined the word “during.” Lane correctly points out that the Alabama Pattern Jury Instructions define “during” as follows: “ ‘During’ means in the course of the commission of or in connection with (or in immediate flight from) the commission of the robbery.” (Lane’s brief, at 44), quoting Alabama Pattern Jury Instructions— Criminal, p. 5-27 (3d ed. 1994). Lane contends that the trial court misstated the law and lessened the State’s burden of proof when it answered the jury’s question and stated: “So that’s a very broad definition. So during means, basically, anytime during the commission of the robbery.... But that ought to be clear.” (Lane’s brief, at 42.)
*1107 Lane argues that the definition of “during” is not broad. Rather, he argues, taking property as a mere afterthought will not sustain a conviction for capital murder. Essentially, Lane is arguing that the trial court’s characterization of the definition of “during” led the jury to believe that it could convict Lane of capital murder even if it believed that the robbery was a mere afterthought., We disagree.
As noted in the previous subsection, the trial court, in its initial instructions and in answering the jury’s question, defined “during” in compliance with the Alabama Pattern Jury Instructions. That definition adequately conveys that the murder must have some connection to the robbery. The trial court’s statement that “during means, basically, anytime during the commission of the robbery” is not an incorrect statement of the law. If the robbery were a mere afterthought to the murder, then, by definition, the murder would not have occurred during the robbery.
Lane also argues that “the definition of ‘during[1] is not broad, contrary to the court’s instruction.” (Lane’s brief, at 43.) According to Lane, the fact that the trial court characterized the definition as “broad” expanded it to cover the situation in which the robbery was an afterthought. However, the definition given by the court was correct and did not encompass the situation in which the robbery was an afterthought. The fact that the trial court characterized the definition as “broad” did not change the content of the definition. Therefore, we find no error, plain or otherwise, in the court’s jury instructions.
C.
Finally, Lane argues that the trial court erred by failing to charge the jury on robbery. As noted, Lane did not request such a jury charge at trial, nor did he object to any of the trial court’s jury instructions or lack thereof. Accordingly, we must determine only whether the trial court’s failure to sua sponte give a robbery charge constituted plain error.
A review of the record indicates that the jury was instructed that it could find Lane guilty of capital murder, guilty of intentional murder, or not guilty. Lane asserts that the evidence also supported a jury charge on robbery or theft.
Additionally, Lane argues that the jury had no way to punish him for the robbery except to find him guilty of capital murder. Lane cites Beck v. Alabama, 447 U.S. 625, 634, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), quoting Keeble v. United States, 412 U.S. 205, 208, 212-13, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973), in which the United States Supreme Court noted that, “[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction.”
However, Beck is distinguishable from the present case. In Beck, the trial court was precluded by statute from charging the jury on a lesser-included offense to capital murder. In Hopper v. Evans, 456 U.S. 605, 609, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), the Supreme Court noted:
“The petitioner in Beck was also involved in a robbery in the course of which a murder occurred. He contended, however, that he did not kill the victim or intend his death. Instead he claimed that while he was attempting to tie up the victim, an 80-year-old man, his accomplice unexpectedly struck and killed the man. The State conceded that, on the evidence in that case, Beck would have been entitled to an instruction on the lesser included, noncapital offense of felony murder except for the preclusion clause.”
*1108 Alabama no longer has a “preclusion” clause in its capital-murder statute. In fact, the trial court in the present case instructed the jury on the lesser-included offense of intentional murder.
Hopper also clarified the holding in Beck. In Hopper, the Supreme Court stated:
“The Beck opinion considered the alternatives open to a jury which is constrained by a preclusion clause and therefore unable to convict a defendant of a lesser included offense when there was evidence which, if believed, could reasonably have led to a verdict of guilt of a lesser offense. In such a situation, we concluded, a jury might convict a defendant of a capital offense because it found that the defendant was guilty of a serious crime....
“It is important to note that our holding in Beck was limited to the question submitted on certiorari, and we expressly pointed out that we granted the writ in that case to decide whether a jury must be permitted to convict a defendant of a lesser included offense ‘when the evidence would have supported such a verdict.’ 447 U.S., at 627. Thus, our holding was that the jury must be permitted to consider a verdict of guilt of a noncap-ital offense ‘in every case’ in which ‘the evidence would have supported such a verdict.’ ”
456 U.S. at 610 (emphasis added).
In the present case, the evidence did not support a charge of robbery. As noted previously, Lane admitted that he intentionally killed Wright and drove.away in Wright’s vehicle. Had the jury believed that the robbery was an afterthought, it had the option of convicting Lane only of intentional murder. There was no reasonable theory from the evidence that Lane was guilty only of robbery and nothing else. Had the jury been given the option to convict Lane of robbery only, it would have likely caused confusion considering that Lane admitted to shooting Wright. See Thompson, 153 So.3d at 152 (quoting Miller v. State, 63 So.3d 676, 701 (Ala.Crim.App.2010), quoting in turn Reeves v. State, 807 So.2d 18, 41 (Ala.Crim.App.2000)) (“‘“Although ... [a] defendant is entitled to have the trial court instruct the jury on his theory of defense, it is ... well established that [t]he trial judge may refuse to give a requested jury charge when the charge is ... confusing, misleading, ungrammatical, [or] not predicated on a consideration of the evidence....”’ ”).
Because Lane was not entitled to an instruction on robbery, we find no error, plain or otherwise, in the trial court’s failure to give such an instruction sua sponte.
V.
Next, Lane asserts that the confession he gave to police was improperly admitted because, he says, the statement was involuntary. Lane also contends that, although he waived his Miranda rights, the waiver was not knowing, intelligent, and voluntary. Lane also argues that the trial court erred by failing to hold a hearing on his motion to suppress the statement.
A.
As noted, Lane confessed to shooting Wright and driving away in Wright’s vehicle. Lane’s confession was given during a police interrogation, a recording of which was admitted at trial. Before trial, Lane filed a motion to suppress “any and all statements made by him to law enforcement officers concerning the death of Frank Wright....” (C. 112.) Lane asserted that the statements were made “under extremely coercive circumstances in the absence of counsel and without an intelligent and knowing waiver of *1109 counsel, since [Lane] has an I.Q. of no more than 70, as his expert is prepared to testify.” (C. 112.)
The following day, the trial court held a hearing to dispose of pretrial motions. When it addressed Lane’s motion to suppress, defense counsel stated:
“The State and I have discussed [the motion to suppress] this morning. I was tardy in getting these motions to them. And they are not prepared to go forward on that, by virtue of not having their witness here, and I understand that.... Can we hold this one until trial time?”
(MH. 11.)[12] The trial court agreed. However, defense counsel never raised the issue of suppression at any time during the trial, nor did he object when the recording of Lane’s confession was entered into evidence.
On appeal, Lane argues that he was entitled to a hearing on his motion to suppress. In support of that contention, Lane cites Ex parte Jackson, 836 So.2d 973 (Ala.2001), and Lewis v. State, 27 So.3d 600 (Ala.Crim.App.2008). Although those cases do stand for the proposition that a defendant is entitled to a hearing on a motion to suppress, i.e., that the trial court should not summarily deny such a motion, they are distinguishable from the present case.
In both Jackson and Lewis, the defendant filed a motion to suppress that was summarily denied by the trial court. The majority opinion in Jackson notes the following procedural history:
“The record indicates that on January 30, 1998, Jackson filed a pretrial motion to suppress his statement made to a law-enforcement officer. On February 2, 1998, the trial court denied the motion, by entering the following order on the first page of the motion: ‘Ordered, motion denied without a hearing.’ (C.R. 49.) At trial, Jackson entered two objections to the admission of his statement, one of them specifically referencing the pretrial motion to suppress. The trial court overruled Jackson’s objections and admitted the statement. The specificity of the trial court’s order denying Jackson’s motion to suppress his statement indicates that the trial court was aware of Jackson’s request for a hearing and that the trial court’s determination was final. Jackson suffered an adverse ruling; therefore, the error is preserved for review.”
836 So.2d at 974. Similarly, in Lewis, the defendant renewed his motion to suppress during trial; however, the trial court denied the motion without holding a hearing.
In the present case, the trial court never ruled on Lane’s motion. The trial court set a hearing for the motion to suppress; however, at defense counsel’s request, the hearing was postponed until trial. Once the trial began, defense counsel never mentioned the motion and did not raise a single objection to the admission of Lane’s statement. Thus, there is no adverse ruling to review, and we must determine only whether it was plain error for the trial court not to hold a hearing on the motion sua sponte.
As noted, the trial court in both Jackson and Lewis was -aware of the defendant’s desire to have a suppression hearing. That was evident because, in both cases, the defendant raised the issue at trial. Lane certainly had the right to have a hearing on his motion to suppress. However, defense counsel’s silence on the issue could be interpreted by the trial court only as a waiver of the hearing.
*1110 Additionally, it was defense counsel who caused the initial hearing to be postponed. Thus, if any error did occur, it was invited by defense counsel’s actions. “Invited error applies in death-penalty cases and operates to waive the error unless the error rises to the level of plain error.” Boyle v. State, 154 So.3d 171, 187 (Ala.Crim.App.2013), citing Williams v. State, 710 So.2d 1276, 1316 (Ala.Crim.App.1996).
Moreover, a review of the record also reveals that the admission of Lane’s interrogation could have actually helped to bolster Lane’s defense, i.e., that the robbery was an afterthought. When defense counsel cross-examined Det. Torrence, the witness who authenticated the recording of Lane’s confession, counsel emphasized the fact that Lane did not confess to robbing Wright. Defense counsel asked the following question: “And Detective Torrence, the word robbery was never used in that entire hour we just listened to. That word is not used by you or [Lane] in that entire tape, is it?” Torrence relied, “That’s correct.” Thus, we do not find that the admission of Lane’s interrogation adversely affected Lane’s substantial rights. Accordingly, the trial court’s failure to hold a suppression hearing sua sponte did not constitute plain error.
B.
Lane also argues that the waiver of his Miranda rights was not knowing, intelligent, and voluntary. In support of that contention, Lane refers to his previous argument, discussed in Section I of this opinion, in which he asserted that he was mentally retarded. Lane points to Dr. Goffs report, as well as Dr. Goffs testimony at Lane’s Atkins hearing, in which Dr. Goff stated that Lane had an I.Q. of 70, that he tended to confabulate, and that his communication skills were limited. Lane also argues that the recording of his confession, in which he required assistance in reading one word from the Miranda waiver form, demonstrates his limited intellectual functioning. According to Lane, these factors show that he did not understand his Miranda rights and, consequently, that his waiver of those rights was invalid.
This Court has held:
“‘Having a low IQ will not render a waiver ineffective unless the individual’s IQ is so low that the person attempting to waive his rights absolutely cannot understand his Miranda rights. Arnold v. State, 448 So.2d 489 (Ala.Crim.App.1984).
“‘“We have often held that ‘the fact that a defendant may suffer from a mental impairment or low intelligence will not, without other evidence, render a confession involuntary.’ See Colorado v. Connelly, 479 U.S. 157, 163-65, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986); Baker v. State, 599 So.2d 60, 63 (Ala.Cr.App.1991), State v. Austin, [596 So.2d 598 (Ala.Cr.App.1991)], Holladay v. State, 549 So.2d 122 (Ala.Cr.App.1988), aff’d, 549 So.2d 135 (Ala.1989), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).”
“‘Youngblood v. State, 656 So.2d 385, 387 (Ala.Cr.App.1993).
“‘“[A] defendant’s mental impairment, even if it exists, is merely one factor affecting the validity of his waiver of rights and the voluntariness of his confession. See generally Annot., 8 A.L.R.4th 16 (1981). ‘While an accused’s intelligence and literacy are important factors to be considered in determining whether he intelligently and voluntarily waived his constitutional rights and made a confession, weak intellect or illiteracy alone will *1111 not render a confession inadmissible.’ Hobbs v. State, 401 So.2d 276, 282 (Ala.Cr.App.1981)”
“‘Whittle v. State, 518 So.2d 793, 796-97 (Ala.Cr.App.1987).
“ ‘Although it is undisputed that the appellant’s mental capabilities were below average, but ‘average’ is the middle mark, there is no evidence that the appellant could not understand that he had the right to remain silent and that he had the right to an attorney. The court did not err in receiving the appellant’s confession into evidence at trial.’ ”
Albarran v. State, 96 So.3d 131, 153 (Ala.Crim.App.2011), quoting Dobyne v. State, 672 So.2d 1319, 1337 (Ala.Crim.App.1994).
In the present case, Det. Torrence testified that he read Lane his Miranda warnings from a document that was later admitted as State’s exhibit 98. That document stated the following:
“1. You have the right to remain silent.
“2. Anything you say can and will be used against you in a court of law.
“3. You have the right to talk to a lawyer and have him present with you while you are being questioned.
“4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.
“5. If you wish to answer questions now without a lawyer present you still have the right to stop answering at any time.
“6. It is not necessary that you answer questions posed by a detective or any other Birmingham Police Department official, prior to having a bond set by the court.”
(C. 489.) The document also contains the following language, which Lane read aloud:
“I have read the above and understand fully each of these rights. Having these rights in mind, I wish to make a voluntary statement and answer any questions without contacting an attorney or having one present. No force, threats, or promises have been used by anyone in any way to make me sign this, and I sign this statement after having been orally advised of my Constitutional rights set out above, and understanding them in full.”
(C. 489.) Lane’s signature appears at the bottom of the form.
A review of State’s exhibit 100, the recording of Lane’s interrogation, reveals that, with the exception of the word “contacting,” Lane was able to read the entire passage without assistance. Additionally, Det. Torrence testified that neither he nor anyone in his presence threatened or coerced Lane into making a statement. Det. Torrence also stated that Lane was not promised anything in return for his statement, nor was Lane told that it would be better or worse for him if he talked to the police. (R. 550.)
Aside from Lane’s low I.Q., there is nothing in the record to suggest that he did not understand his rights. The State presented sufficient evidence to demonstrate that Lane’s Miranda waiver was knowing, intelligent, and voluntary. Dr. Goffs testimony regarding Lane’s low intellectual functioning, on its own, is insufficient to convince this Court that Lane did not understand his Miranda rights. Additionally, the record does not support Lane’s contention that the interrogating officers had a duty to make special efforts to ensure his understanding of his rights. No evidence was presented suggesting that the officers were or should have been aware of Lane’s level of intellectual functioning. Accordingly, the trial court did not commit plain error by admitting Lane’s statement into evidence.
*1112 C.
Lane next contends that his statement was involuntarily obtained because, he says, his statement “resulted from his tendency to parrot the officers’ questions.” (Lane’s brief, at 53.) Lane again points to his low intellectual functioning and Dr. Goffs testimony that Lane tends to confabulate in arguing that his statement was involuntary. According to Lane, “rather than a free-will recitation of the events of the offense, Mr. Lane’s statement likely included a number of fabrications because of his need to compensate for his mental retardation.” (Lane’s brief, at 54.)
However, Lane gave only one such example. During the interrogation, “Detective Torrence prompted Mr. Lane with the possibility that [Lane’s] actions were due to the victim’s ‘homosexual advances’ or use of racial slurs.” (Lane’s brief, at 54-55.) Lane eventually told Det. Torrence that the victim called him a “nigga boy.” (State’s exhibit 100.) As best we can determine, Lane’s argument is that this statement is false. However, Det. Tor-rence never used the phrase, “nigga boy.” Rather, Det. Torrence only suggested that perhaps Lane shot Wright because Wright used a racial slur.
We also note that Lane does not assert that the actual confession, wherein he admitted to shooting Wright and driving away in Wright’s vehicle, was false. A review of the recording reveals no other instances in which Lane “parroted” the officers’ statements. Accordingly, this argument is not supported by the record.
Lane also argues that his confession was induced by an improper promise. During the interrogation, Det. Tor-rence began to tell Lane how upset Lane’s grandmother was likely to be regarding the accusations against Lane. Det. Tor-rence told Lane that it would be good if Lane told his side of the story regarding what happened at the car wash. Det. Tor-rence then told Lane that if he would tell his side of the story, then Lane would be able to call his grandmother.
“‘“It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe[ v. Connecticut], 367 U.S. [568,] 602, 81 S.Ct. [1860,] 1879 [(1961)], the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, ‘if his will has been overborne ’ by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
“‘“The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the ‘totality of the circumstances.’ Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.)(stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. *1113 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990)(stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is ‘whether the defendant’s will was overborne at the time he confessed’Xemphasis added). Thus, to determine whether McLeod’s confession was improperly induced, we must determine if his will was ‘overborne’ by an implied promise of leniency.
[[Image here]]
Thus, the test of involuntariness of a confession, or other inculpa-tory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant’s will was overborne by ‘apprehension of harm or hope of favor.’ See [Ex parte] Gaddy, 698 So.2d [1150] at 1154 [(Ala.1997)] (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala.1988)); Culombe, 367 U.S. at 602, 81 S.Ct. at 1879; Jackson, 562 So.2d at 1380. To determine if a defendant’s will has been overborne, we must assess ‘the conduct of the law enforcement officials in creating pressure and the suspect’s capacity to resist that pressure’; ‘[t]he defendant’s personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant’s] susceptibility to police pressures.’ Jackson, 562 So.2d at 1380-81 (citations omitted).”
“‘McLeod v. State, 718 So.2d 727, 729-30 (Ala.1998) (footnote omitted).’ ” Harris v. State, 2 So.3d 880, 894-95 (Ala.Crim.App.2007), quoting Jones v. State, 946 So.2d 903, 915-16 (Ala.Crim.App.2006).
A review of the recording reveals that Det. Torrence did not tell Lane that he must confess to the crime before he would be able to call his grandmother. Rather, he implored Lane to “just tell the truth.” (State’s exhibit 100.) Det. Torrence told Lane that it would be better for Lane’s grandmother to know Lane’s side of the story. At no point was Lane’s ability to speak with his grandmother conditioned on Lane’s giving a confession. Nothing else in the recording suggests that Lane’s will was overborne to such an extent as to render his confession involuntary.
Because Lane gave a valid waiver of his Miranda rights followed by a voluntary confession, we hold that the trial court did not commit error, plain or otherwise, in allowing Lane’s statement to be received into evidence.
VI.
Lane next argues that the State used its peremptory challenges in a racially discriminatory manner, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Lane, a black male, was tried by an all-white jury. After the jury was selected, Lane objected to several of the State’s peremptory strikes and stated that many of the veniremembers struck by the State were black and that the selected jury was all white. The trial court denied each objection and did not require the State to give race-neutral reasons for striking the prospective jurors. Lane objected to the trial court’s failure to require the State to provide race-neutral reasons for its strikes.
In evaluating a Batson claim, courts must follow a three-step process. As the United States Supreme Court ex *1114 plained in Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003):
“First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. [Batson v. Kentucky,] 476 U.S. [79,] 96-97 [(1986)]. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Id., at 97-98. Third, in light of the parties’ submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Id., at 98.”
537 U.S. at 328-29. Because the trial court did not require the State to give race-neutral reasons for its strikes, we need address only the first step in the process outlined above, i.e., we must determine only whether Lane made a prima facie showing of racial discrimination.
In Ex parte Branch, 526 So.2d 609, 622-23 (Ala.1987) (footnote omitted), the Alabama Supreme Court discussed the requirements for establishing a prima facie case of racial discrimination as follows:
“The burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination. In determining whether there is a prima facie ease, the court is to consider ‘all relevant circumstances’ which could lead to an inference of discrimination. See Batson, 476 U.S. at 93, 106 S.Ct. at 1721, citing Washington v. Davis, 426 U.S. 229, 239-42, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976).”
The Alabama Supreme Court also noted that, to establish a case of discrimination,
“‘the defendant first must show that he is a member of a cognizable racial group, Castaneda v. Partida, [430 U.S. 482, 494, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977)], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant’s race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits ‘those to discriminate who are of a mind to discriminate.’ Avery v. Georgia, [345 U.S. 559, 562, 73 S.Ct. 891, 97 L.Ed. 1244 (1953)]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empanelling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.’ ”
Branch, 526 So.2d at 622 n. 11, quoting Batson, 476 U.S. at 96.
Furthermore, this Court has held:
“In the first step of the process, the step at issue here, ‘[t]he party alleging discriminatory use of a peremptory strike bears the burden of establishing a prima facie case of discrimination.’ Ex parte Brooks, 695 So.2d 184, 190 (Ala.1997). ‘In addition to showing that the State used peremptory challenges to remove members of a cognizable group ... and relying upon the fact that peremptory strikes permit discrimination, a claimant also must show that these facts and any other relevant facts raise an inference that the prosecutor used his strikes in a discriminatory manner.’ Madison v. State, 718 So.2d 90, 101 (Ala.Crim.App.1997). ‘The facts and circumstances necessary to establish a prima facie case of purposeful discrimination in the jury selection process will, of course, vary from case to case, depending on the particular facts and circumstances involved.’ Kidd v. State, 649 So.2d 1304, *1115 1311 (Ala.Crim.App.1994). While it is true the striking of one person for a racial reason is a violation of the principles of Batson and grounds for reversal, see Williams v. State, 548 So.2d 501, 507 (Ala.Crim.App.1988), it is equally true that ‘[m]erely showing that the challenged party struck one or more members of a particular race is not sufficient to establish a prima facie case.’ Edwards v. State, 628 So.2d 1021, 1024 (Ala.Crim.App.1993).”
Lightfoot v. State, 152 So.3d 434, 438 (Ala.Crim.App.2012), reversed on other grounds by Ex parte Lightfoot, 152 So.3d 445 (Ala.2013).
Additionally, in Johnson v. State, 823 So.2d 1 (Ala.Crim.App.2001), this Court held that the defendant had failed to make a prima facie showing of discrimination because he had offered no evidence other than statistics and defense counsel’s opinion that no valid reasons for striking the jurors had been revealed during voir dire questioning. This Court stated:
“‘In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court set out the components of a prima facie case of racial discrimination in jury selection. In addition to showing that the State used peremptory challenges to remove members of a cognizable group to which he belongs and relying upon the fact that peremptory strikes permit discrimination, a claimant also must show that these facts and any other relevant facts raise an inference that the prosecutor used his strikes in a discriminatory manner. In Ex parte Branch, 526 So.2d 609, 622-623 (Ala.1987), the Alabama Supreme Court explained that relevant factors could include, but were not limited to, the following: evidence that the jurors shared only the characteristic of their group membership and were heterogeneous in all other respects; a pattern of strikes against black jurors; past conduct of the prosecutor; type and manner of the prosecutor’s questions during voir dire, including desultory voir dire; type and manner of questions to the challenged juror, including a lack of questions or meaningful questions; disparate treatment of veniremembers with the same characteristics or type of responses; disparate examination of members of the venire; circumstantial evidence of intent due to the use of most challenges to strike African-Americans; and the use of peremptory challenges to dismiss all or most black jurors.’
“Madison v. State, 718 So.2d 90, 101-102 (Ala.Crim.App.1997), aff’d, 718 So.2d 104 (Ala.), cert. denied, 525 U.S. 1006, 119 S.Ct. 521, 142 L.Ed.2d 432 (1998).
“Johnson offered no evidence, other than statistics and his counsel’s opinion that no valid reasons for striking these jurors were revealed during voir dire, to show that the prosecutor exercised his strikes in a discriminatory manner. See, e.g., Duncan v. State, 827 So.2d 838, 855-57 (Ala.Crim.App.1999), aff’d, 827 So.2d 861 (Ma.2001)(Batson motion in which counsel asserted only statistics and his opinion that nothing was revealed during voir dire to provide a legitimate reason for the strikes held insufficient to satisfy defendant’s burden of proving a prima facie case). Johnson did not offer evidence, nor even allege, that the struck veniremembers shared only the characteristic of race, that there was a lack of meaningful voir dire directed at black veniremembers, that black and white veniremembers were treated differently, or that the prosecutor had a history of using peremptory *1116 challenges in a manner that discriminated against black veniremembers. Johnson noted only that the State used 6 (less than half of its 14) strikes to remove 6 of the 9 African-Americans from the venire, and that, in his counsel’s opinion, no articulable reason for the strikes was revealed during voir dire. We do not find the statistics or defense counsel’s assertions that in his opinion no legitimate reasons for the strikes were revealed during voir dire to be sufficient to establish a prima facie case of racial discrimination. ‘A circuit court’s ruling on a Batson objection is entitled to great deference, and we will reverse such a ruling only if it is clearly erroneous.’ Talley v. State, 687 So.2d 1261, 1267 (Ala.Crim.App.1996). ‘“[A] finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.”’ Davis v. State, 555 So.2d 309, 312 (Ala.Crim.App.1989), quoting Powell v. State, 548 So.2d 590, 594 (Ala.Crim.App.1988), aff’d, 548 So.2d 605 (Ala.1989), quoting, in turn, Anderson v. City of Bessemer, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Based on the scant record before us, we simply cannot say with a ‘definite and firm conviction’ that the trial court erred in finding that Johnson did not establish a prima facie case of racial discrimination.”
Johnson v. State, 823 So.2d at 19-20. With these principles in mind, we will address each of Lane’s Batson issues.
A.
In the present case, the venire consisted of 42 potential jurors after the strikes for cause; of the remaining venire-members, 14 were black.[13] The State used 8 of its 14 peremptory strikes against black jurors. Lane struck the remaining six black jurors, resulting in Lane’s having been tried by an all-white jury. The trial court conducted a Batson hearing outside the presence of the jury, during which Lane objected to the State’s peremptory strikes against the following jurors: juror number 8, juror number 266, juror number 345, juror number 399, juror number 353, and juror number 395.[14] Defense counsel pointed out that these jurors were black and asserted that he did not see any valid reasons for their removal. The State also struck two other black males: juror number 68 and juror number 357. However, Lane did not object to their removal at trial.
At trial, Lane argued that the number of strikes against black veniremembers and the fact that he was being tried by an all-white jury was sufficient to establish a prima facie case of racial discrimination. In attempting to establish a prima facie case of racial discrimination at trial, Lane informed the trial court that each of the challenged jurors was black and that the jury was all white. Additionally, defense counsel stated that he saw no valid reasons for striking them.
Lane did not offer any evidence, or even allege, that the struck veniremembers shared only the characteristic of race, that *1117 there was a lack of meaningful voir dire directed at black veniremembers, that black and white veniremembers were treated differently, or that the prosecutor had a history of using peremptory challenges in a manner that discriminated against black veniremembers. Rather, it appears that, similar to the appellant in Johnson, supra, Lane merely named six of the veniremembers who had been removed by the prosecution, stated that those veniremembers were black, and opined that there were no valid reasons for striking them. When Lane was unable to provide any additional evidence or arguments regarding the challenged veniremembers, aside from the fact that the jury was all white, the trial court denied his motions.
“ ‘It is well settled that the ruling of the trial court on a Batson hearing is entitled to substantial deference and will not be disturbed on review unless it is “clearly erroneous.”’” Rice v. State, 84 So.3d 144, 151 (Ala.Crim.App.2010), quoting Ex parte Bankhead, 625 So.2d 1146, 1148 (Ala.1993) (internal citation omitted). “ ‘ “[A] finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.”’” Fletcher v. State, 703 So.2d 432, 436 (Ala.Crim.App.1997), quoting Davis v. State, 555 So.2d 309, 312 (Ala.Crim.App.1989), quoting in turn Powell v. State, 548 So.2d 590, 594 (Ala.Crim.App.1988). Lane’s objections at trial were based solely on the facts that the challenged jurors were black, that Lane was being tried by an all-white juiy, and that defense counsel did not see any valid reasons to strike the challenged veniremembers. Such a showing is insufficient to establish a prima facie case of racial discrimination. See Johnson v. State, supra; Lightfoot v. State, 152 So.3d 434, 438 (Ala.Crim.App.2012), reversed on other grounds, 152 So.3d 445 (Ala.2013), quoting Edwards v. State, 628 So.2d 1021, 1024 (Ala.Crim.App.1993) (“‘[mjerely showing that the challenged party struck one or more members of a particular race is not sufficient to establish a prima facie case’”). Accordingly, the State was not required to put forth race-neutral reasons for its strikes against the six veniremembers identified by Lane.
B.
On appeal, Lane raises additional arguments in support of his contention that the State used its peremptory strikes in a discriminatory manner in violation of Batson. Because these arguments were not first raised in the trial court, they are not properly preserved for appellate review. See Wilson v. State, 142 So.3d 732, 773 (Ala.Crim.App.2010) (opinion on return to remand) (“[t]he statement of specific grounds of objection waives all grounds not specified”). However, we review them to determine whether they establish plain error pursuant to Rule 45A, Ala. R.App. P.
In discussing plain error in the context of Batson, this Court has held:
“Plain error is
“ ‘error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Taylor, 666 So.2d 73 (Ala.1995). The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant. Taylor.’
“Ex parte Trawick, 698 So.2d at 167.
“Moreover,
“ ‘ “ ‘[f]or plain error to exist in the Batson context, the record must raise an inference that the state [or the defendant] engaged in “purposeful discrimination” in the exercise of its *1118 peremptory challenges. See Ex parte Watkins, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).’”’
“Smith v. State, 756 So.2d 892, 915 (Ala.Crim.App.1998), aff’d, 756 So.2d 957 (Ala.2000) (quoting Rieber v. State, 663 So.2d 985, 991 (Ala.Crim.App.1994), quoting in turn other cases).”
Ex parte Walker, 972 So.2d 737, 742 (Ala.2007).
1.
Lane first asserts that the State used 8 of its 14 peremptory strikes, or “nearly sixty percent,” to remove black jurors. (Lane’s brief, at 59.) However, this argument is different from the one Lane made to the trial court. At the Batson hearing, Lane objected only to the State’s striking 6 of the 14 black jurors. Additionally, Lane did not specifically argue that the State had used a high percentage of its strikes against blacks. Rather, he simply identified 6 of the 8 blacks struck by the State and opined that there were no valid reasons for striking them. Thus, Lane’s argument that the State used a high percentage of its peremptory strikes against blacks is not preserved and will be reviewed only for plain error.
In Rice v. State, 84 So.3d 144, 148 (Ala.Crim.App.2010), the defense based its Bat-son motion “solely on the number of black veniremembers the prosecution struck.” Although the trial court in Rice required the prosecution to give race-neutral reasons, this Court questioned whether the defense made out a prima facie case and stated: “ ‘Alabama courts have recently held that even a showing that [a] party had ... a high percentage of strikes used against a minority was not alone enough [to establish a prima facie ease of racial discrimination].’” 84 So.3d at 148, quoting Armstrong v. State, 710 So.2d 531, 533 (Ala.Crim.App.1997). In Armstrong, this Court went on to note that Ex parte Branch, supra, listed nine relevant factors a trial judge could consider in determining whether a prima facie case of discrimination had been shown. Thus, we held that, although “statistical evidence can play a role in establishing a prima facie case, that type of evidence alone cannot support a prima facie case; the other factors listed in Branch should also be considered.” 710 So.2d at 534.
Lane cites McGahee v. Alabama Department of Corrections, 560 F.3d 1252, 1267 (11th Cir.2009), for the proposition that total exclusion of blacks from a jury is sufficient to show intentional discrimination. However, in McGahee, the prosecution was solely responsible for removing blacks from the venire.[15] In the present case, the record reflects that, although the State used 8 of its 14 peremptory strikes against black veniremembers, Lane used 6 of his 14 peremptory strikes to remove the remaining black veniremembers. Thus, Lane’s case in distinguishable from McGa-hee.
Lane also cites Ex parte Thomas, 659 So.2d 3 (Ala.1994), in which the prosecution used 9 out of its 10 peremptory strikes to remove black jurors. In Thomas, the Alabama Supreme Court noted:
“We have held, since the release of [Harrell v. State, 555 So.2d 263 (Ala.1989)], that a defendant can establish a prima facie case solely on the fact that a prosecutor used a large number of his peremptory challenges to strike black veniremembers. See Ex parte Williams, 571 So.2d 987, 990 (Ala.1990) (holding that the prosecutor’s use of four *1119 of his five peremptory strikes to remove blacks was sufficient to establish a prima facie case).”
659 So.2d at 5 n. 1. As noted, the State used 8 out of its 14 strikes, or, approximately 57 percent, to remove black jurors. In Thomas and the cases cited therein, the State used a significantly higher percentage of its strikes to exclude black venire-members than the State used in the present case. See Thomas, 659 So.2d at 4 (90 percent of State’s peremptory challenges used to strike black jurors); Williams, 571 So.2d at 990 (80 percent of State’s peremptory challenges used to strike black jurors). Thus, we find Thomas and Williams to be distinguishable as well.
The fact that the State used 8 of its 14 peremptory strikes against black venire-members does not raise an inference that the State engaged in purposeful discrimination, especially considering the fact that Lane used 6 of his 14 peremptory strikes to remove the remaining black venire-members. Accordingly, the trial court did not commit plain error in finding that Lane failed to establish a prima facie case of racial discrimination on this basis.
2.
Lane next argues that “[t]he State’s desultory voir dire supports an inference of discrimination.” (Lane’s brief, at 60.) Lane asserts that three of the State’s peremptory strikes were used against venire-members who offered no information during voir dire other than their name, neighborhood, occupation, marital status, and spouse’s job. Specifically, he refers to juror number 395, juror number 399, and juror number 357. Lane also contends that the State’s striking of juror number 8, juror number 266, and juror number 353 supports an inference of discrimination because, he says, those veniremembers offered only brief responses during group voir dire and did not take part in any individual voir dire.
The record reflects that the State asked the veniremembers questions regarding prior jury service; whether they could ever consider the death penalty; whether they knew any of the parties, lawyers, or witnesses; whether they remembered the case; whether they were familiar with the area where the crime occurred; whether they or anyone close to them had been a victim of a violent crime; and whether they or someone they know had ever been charged with a crime.
Furthermore, during group voir dire, juror number 8 revealed that her brother had been charged with attempted murder; juror number 266 revealed that he had previously served on a jury that returned a not-guilty verdict and that his brother had been the victim of a shooting; juror number 353 revealed that her brother had been murdered and that she had previously served on a civil jury that returned a “guilty” verdict (R. 89); and juror number 399 volunteered that her nephew was dating someone with the surname Lane. Thus, valid reasons for these strikes can be gleaned from the record. In fact, the trial court noted several of these reasons during the Batson hearing.
Although it is true that juror number 395 and juror number 357 were struck despite offering nothing other than biographical information, a review of the record reveals that Lane struck 12 veniremembers who similarly offered no additional information during voir dire. We also note that 5 of those 12 were black. Thus, the record does not establish that the State conducted an inadequate or desultory voir dire. Accordingly, we do not find that the trial court committed plain error by finding that Lane failed to demonstrate a prima facie case of racial discrimination on this basis.
*1120 3.
Next, Lane asserts that the State engaged in disparate treatment of certain veniremembers. Specifically, Lane points to seven white veniremembers who, like juror number 395 and juror number 357 offered no additional information beyond basic biographical information during voir dire but nevertheless served on the jury. Lane contends that the only difference between those seven jurors and juror number 395 and juror number 357 is their race. Additionally, Lane points out that three white jurors had previously served on juries. Lane notes that juror number 266 and juror number 353 also indicated that they had prior jury service but were nevertheless struck by the State. Lane contends that this leads to an inference of discrimination.
However, each of the white jurors who indicated that they had previously served on juries also stated that they never actually deliberated. Juror number 438 stated that she had been an alternate juror and did not deliberate; juror number 476 stated that a mistrial had been declared in the case in which he served; and juror number 317 stated that the case he served on settled before deliberations began. In contrast, juror number 266 stated that he was on a criminal jury that returned a not-guilty verdict and juror number 353 stated that she served on a civil jury and “they was found guilty.” (R. 89.) Thus, the record reveals that there were differences between those veniremembers other than their race.
As to the other jurors who offered no additional information during voir dire, there is nothing in the record to suggest that the prosecution used its peremptory strikes in a discriminatory manner. As noted, Lane also struck several 'venire-members, both black and white, who offered nothing besides biographical information. Accordingly, the record does not show an inference of discrimination on this basis; therefore we find no plain error in this regard.
4.
Next, Lane contends that the eight black veniremembers- struck- by the State had little in common other than their race. However, the record refutes this contention. As previously noted, juror number 266 and juror number 353 both indicated prior jury service. Additionally, juror number 266 and juror number 353 indicated that they had family members who had been victims of violent crimes. Juror number 68 and juror number 8 each stated that members of their families had been charged with violent crimes. Thus, 4 of the 8 challenged veniremembers had been exposed in some way to the criminal-justice system. Furthermore, juror number 395 and juror number 399 both work in education: juror number 395 is a prekindergarten teacher and juror number 399 works as a paraeducator. Thus, many of the challenged jurors share commonalities besides race. Accordingly, the record does not support Lane’s contention, and, consequently, there was no plain error in this regard.
5.
Finally, Lane asserts that the Jefferson County District- Attorney’s Office has a history of discrimination in the context of selecting juries. In support of that contention, Lane cites several cases that, he says, originated out of the Jefferson County District Attorney’s Office and required reversals and/or remands due to Batson violations.
This Court addressed a similar claim in McCray v. State, 88 So.3d 1, 24 (Ala.Crim.App.2010):
“[T]o the extent that the Houston County District Attorney’s Office has a histo *1121 ry of racial discrimination, that history is attenuated. ‘The opinions reversing the Houston Circuit Court on Batson grounds date from 1991, [almost 20] years ago. The most recent of those opinions was published in 1998, [over 12] years ago.’ Floyd[ v. State] [Ms. CR-05-0935, August 29, 2008], — So.3d at - [(Ala.Crim.App.2007) ] (opinion on return to remand)(Welch, J., dissenting). See McCray v. State, 738 So.2d 911, 914 (Ala.Crim.App.1998) (reversing the judgment of the Houston County Circuit Court based on a Batson violation). Accordingly, although the Houston County District Attorney’s Office has a history of using its peremptory strikes in an improper manner, this factor, based on the passage of time, does not establish a prima facie case of racial discrimination.”
Similarly, the most recent case Lane cites is Cochran v. Herring, 43 F.3d 1404 (11th Cir.1995), which was decided more than 18 years ago.[16] Thus, to the extent that the Jefferson County District Attorney’s Office has a history of discriminatory jury selection, that history is attenuated.
Lane also contends that these alleged discriminatory practices still exist in Jefferson County. He cites Riggs v. State, 138 So.3d 1014 (Ala.Crim.App.2013), and asserts that the same prosecutor struck 11 out of 14 black veniremembers in that trial. However, Riggs was remanded for a new trial on grounds unrelated to Batson. Nothing in that opinion nor in the record before us suggests that there was a Batson violation in Riggs.
Lane also cites Jackson v. State, 169 So.3d 1 (Ala.Crim.App.2010), in support of this contention. However, his reliance on Jackson is misplaced. In Jackson, the defendant did not raise a Batson challenge at trial. This Court remanded the case and stated: “Although the State may very well have race-neutral and nondiscriminatory reasons for its challenges, we conclude that a remand for a Batson hearing is necessary in light of the many levels of judicial scrutiny that occur when a defendant is convicted of a capital offense and sentenced to death.” 169 So.3d at 15. No findings were made as to whether the Jefferson County District Attorney’s Office engaged in any discriminatory practices in Jackson.
The cases that Lane cites, none of which were brought to the attention of the trial court, do not raise an inference that the Jefferson County District Attorney’s Office presently engages in discriminatory jury selection. Nothing in the record before us suggests otherwise. Accordingly, the trial court did not commit plain error in finding that Lane failed to make a prima facie showing of racial discrimination in violation of Batson on this basis.
VII.
Lane next argues that the trial court erred when it allowed Wright’s widow, Linda Wright, to testify about her actions and emotions upon realizing that her husband had been killed. Additionally, Lane claims that it was error to allow Linda Wright to testify regarding her husband’s good character, his family, and his funeral. Lane contends that that testimony was irrelevant and constituted improper victim-impact testimony that is prohibited during the guilt phase of a capital-murder trial. Because Lane did not object during any portion of Linda Wright’s testimony, this claim is reviewed only for plain error. See Rule 45A, Ala. R.App. P.
“The Alabama Supreme Court has held that victim-impact statements
*1122 “ ‘are admissible during the guilt phase of a criminal trial only if the statements are relevant to a material issue of the guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible. See C. Gamble, McElroy’s Alabama Evidence § 21.01 (4th ed.1991), citing, inter alia, Fincher v. State, 58 Ala. 215 (1877) (a fact that is incapable of affording any reasonable inference in reference to a material fact or inquiry involved in the issue cannot be given in evidence). If the statements are not material and relevant, they are not admissible.’
“Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993).
“‘[T]he introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law.’ Ex parte Rieber, 663 So.2d 999, 1006 (Ala.1995). The Court in Ex parte Rieber also said:
“‘However, in Ex parte Crymes, 630 So.2d 125 (Ala.1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.’
“663 So.2d at 1005.”
Woodward v. State, 123 So.3d 989, 1021 (Ala.Crim.App.2011).
We first note that much of Linda Wright’s testimony was relevant and was not victim-impact evidence. Her testimony regarding her husband’s habit of always keeping a clean vehicle was relevant to prove that Lane robbed Frank Wright. Earlier testimony from police officers had indicated that Frank Wright’s car appeared to have been ransacked before it was set on fire. Thus, Linda Wright’s testimony was relevant to show that someone had likely gone through her husband’s vehicle.
Linda Wright’s testimony regarding her husband’s occupation as well as his plans to pick her up from the airport on the night he was killed was relevant to show why Wright, a man from Indiana, was near the Birmingham airport on the night in question. Linda Wright stated that she spoke to her husband before she boarded her flight in Indiana and that she was unable to get in touch with him after she landed. She also testified regarding her interactions with police at the airport when she was trying to determine her husband’s whereabouts. That testimony was relevant to help establish the time frame in which Frank Wright was killed. Accordingly, that testimony was admissible during the guilt phase of the trial.
We agree that some of Linda Wright’s testimony was not relevant to any material issues in the case and, therefore, was inadmissible. For example, Linda Wright testified as to her and her sons’ feelings of panic and anguish upon learning that Frank Wright was dead. Additionally, Linda Wright gave biographical information about her husband, testified as to his good character, and gave a brief account of his funeral. Although this testimony was irrelevant, having examined the record in its entirety, we conclude that the irrelevant portions of Linda Wright’s testi *1123 mony did not operate to deny Lane a fair trial or otherwise prejudice his substantial rights. Rule 45 and 45A, Ala. R.App. P.
The jury was instructed that it could not find Lane guilty unless the State proved his guilt beyond a reasonable doubt. Further, the trial court instructed the jury that its determination must come from the evidence or lack of evidence in the case. As noted in Woodward, 123 So.3d at 1022, quoting Ex parte Rieber, 663 So.2d at 1006:
“‘It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [Lane] did not receive a fair trial simply because the jurors were told what they probably had already suspected — that [Frank Wright] was not a “human island,” but a unique individual whose murder had inevitably had a profound impact on [his] children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter’s opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)).’”
Although some of Linda Wright’s testimony was inadmissible, we hold that it did not affect the outcome of Lane’s trial, that it did not prejudice Lane’s substantial rights, and that admitting it did not rise to the level of plain error. Accordingly, Lane is not entitled to relief on this claim.
VIII.
Next, Lane argues that he was denied a fair trial because, he says, the State committed prosecutorial misconduct at various stages of his trial.
A.
Lane first points to the prosecutor’s closing argument in which she remarked that Lane -waited “for just the right moment” to kill Wright and that Lane used a gun with “night sights.” (R. 672.) According to Lane, these statements constitute reversible error because they were “(1) made as of fact, (2) without support by any evidence, (3) pertinent to the issues, and (4) have natural tendency to influence the finding of the jury.” (Lane’s brief, at 80), quoting Jones v. State, 456 So.2d 366, 374-75 (Ala.Crim.App.1983).
In Jones, this Court held that all four of the above-quoted factors must be met in order for unsupported prosecutorial statements of fact to require reversal. This Court also noted that “counsel should have wide latitude in arguing reasonable inferences from the evidence.... ” Jones, 456 So.2d at 374.
A review of the record reveals that the prosecutor’s statements were supported by evidence. During his interrogation, a recording of which was played for the jury, Lane stated that he first observed Wright at the car wash while Wright was in the process of spraying his vehicle. Lane stated that he approached Wright after Wright finished washing the vehicle. Thus, it was a legitimate inference to argue that Lane “wait[ed] for just the right moment” to approach Wright. (R. 672.) Additionally, Lane described the gun. he used as having an “orange light” on it. (State’s exhibit 100.) Therefore, the statement that Lane’s gun had “night sights” was not unsupported by the evidence. Accordingly, Lane has failed to satisfy the second factor listed in Jones and, therefore, has not established that the prosecutor’s comments require reversal.
B.
Lane also argues that the prosecutor improperly compared Lane’s consti *1124 tutional rights with the victim’s rights during the penalty-phase closing arguments by saying:
“[T]he defense attorney told us yesterday, that our system of government in this country and the rights afforded to defendants is the best in the world. And on that, we agree. And it allows a defendant to have a trial. And to ask you for his life. To argue to you mitigating reasons why he should not be put to death.
“But you know who did not have that chance?
“Frank Wright.
“Do you think Frank got to ask Anthony Lane to spare his life?
“Did Frank get to put on his family to tell Anthony Lane the hole it would leave in their heart and their world if he killed him? And to please not do so?
“He didn’t get the right, and the hon- or, and the privilege that Anthony Lane has had here this week. Anthony Lane acted as judge, jury and executioner all in one fell sweep.”
(R. 920-21.) Lane did not object to these remarks at trial; therefore, we will only review this claim only for plain error. See Rule 45A, Ala. R.App. P.
In Thompson v. State, 153 So.3d 84 (Ala.Crim.App.2012), the defendant raised a similar claim. In that case, the prosecutor stated in closing arguments that the defendant “told [his psychologist] to tell you that he doesn’t want to die because he still wants to see his family. He still thinks that he has some right that he didn’t afford the victims of his crimes.” Thompson v. State, 153 So.3d at 171. This Court held:
“Although this Court has frequently noted that a prosecutor should not compare the rights of a victim with those of the defendant, we have held that such arguments rarely rise to the level of plain error.
“ ‘The prosecutor made numerous references to the victim’s rights and several times implied that her rights were to be weighed against the appellant’s. This was clearly improper. However, we think these references were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict.’
“McNair v. State, 653 So.2d 320, 337-38 (Ala.Crim.App.1992) (emphasis added). See also Revis v. State, 101 So.3d 247 (Ala.Crim.App.2011); Brown v. State, 11 So.3d 866, 918-19 (Ala.Crim.App.2007). The argument in this case did not rise to the level of plain error. See McNair, supra.”
Thompson v. State, 153 So.3d at 171-72. Similarly, the isolated comparison to the victim’s rights in the present case, when read in the context of the entire closing argument, does not rise to the level of plain error.
Moreover, the trial court instructed the jury that the arguments of counsel were not evidence and should not be considered as such. Jurors are presumed to follow the court’s instructions. See Burgess v. State, 827 So.2d at 162. Thus, the above-mentioned remarks did not constitute plain error.
C.
Next, Lane argues that his trial was rendered unfair by the prosecutor’s remarks in which she stated that it was her opinion that Lane deserved the death penalty. Specifically, Lane points to the following comments during the prosecution’s penalty-phase closing argument:
“[I]t doesn’t happen everyday because not every case, even every case in which *1125 someone loses their life, merits the ultimate punishment.
“But there are cases that do. And we believe, as we stand here today, that this is one of them.
“That in this case, Anthony Lane should receive the ultimate punishment.
[[Image here]]
“And I think that this case is one of those for which the ultimate price is the only thing that is justice.
“It’s not revenge. It’s not spite. It is simply at its heart what is right.
“And if not this ease, which one?”
(R. 916-17, 922.) According to Lane, these comments prejudiced the jury by emphasizing that the State does not always recommend the death penalty but that it is especially warranted in Lane’s case. Because Lane failed to object to these remarks at trial, we will review this claim only for plain error.
In Vanpelt v. State, 74 So.3d 32, 91-92 (Ala.Crim.App.2009), this Court held:
“In our adversarial system of criminal justice, a prosecutor seeking a sentence of death may properly argue to the jury that a death sentence is appropriate. See Hall v. State, 820 So.2d 113, 143 (Ala.Crim.App.1999). On the other hand, it is impermissible for a prosecutor to urge the jury to ignore its penalty-phase role and simply rely on the fact that the State has already determined that death is the appropriate sentence. See Guthrie[ v. State, 616 So.2d 914, 931-32 (Ala.Crim.App.1993)](holding that a prosecutor’s statement that ‘ “[wjhen I first became involved in this case, from the very day, the State of Alabama, the law enforcement agencies and everybody agreed that this Was a death penalty case, and we still stand on that position” ’ improperly ‘[led] the jury to believe that the whole governmental establishment had already determined that the sentence should be death and [invited] the jury to adopt the conclusion of others, ostensibly more qualified to make the determination, rather than deciding on its own’).
“When the prosecutor’s comments are viewed in context, it is clear that he was properly arguing in favor of a sentence of death and properly reminding the jury of the gravity of its penalty-phase role. For instance, in stating that, ‘if this case does not call for the death penalty, what does,’ the prosecutor was properly arguing that a death sentence is appropriate and appealing to the jury to do justice. See Hall, 820 So.2d at 143. Also, the prosecutor’s comment that his office does not seek a death sentence lightly was not an improper request for the jury to ignore its penalty-phase duty. Instead, this comment merely reminded the jury of the gravity of its penalty-phase decision by informing the jury that in making its penalty phase decision it has an awesome responsibility — one that the State does not lightly ask a jury to shoulder. Cf. Fox v. Ward, 200 F.3d 1286, 1300 (10th Cir.2000) (holding that a ‘prosecutor[’s] [comment to] the jury that he did not undertake the decision to seek the death penalty lightly, and pointed to the different elements that went into making his decision[, was] a permissible line of commentary’).”
Unlike the prosecutor’s comments in Guthrie v. State, 616 So.2d 914, 931-32 (Ala.Crim.App.1993), which are referenced in the preceding quote from Vanpelt, the remarks in the present case did not imply that higher authorities had already determined the appropriate sentence and that the jury should abandon its decision-making role and adopt that conclusion. The challenged comments in the present case were very similar to the comments in Van *1126 pelt. Accordingly, we find no error, plain or otherwise, in the prosecution’s remarks in the present case.
IX.
Next, Lane argues that the trial court erred by admitting into evidence 11 photographs taken during Wright’s autopsy. In his brief, Lane claims that he objected to these photographs at trial. However, a review of the record reveals that Lane raised an objection only regarding photographs of the crime scene. (R. 289.) When the autopsy photographs were admitted, Lane stated that he had no objection. (R. 485.) Accordingly, we will review this claim only for plain error. See Rule 45Á, Ala. RApp. P.
On appeal, Lane asserts that he did not contest the identity of the victim, Lane’s involvement in the shooting, or the cause of death. Therefore, Lane argues that the autopsy photographs did not “ ‘shed light on an issue being tried’ ” and should have been excluded because, he says, they served only to inflame and prejudice the jury. (Lane’s brief, at 84), quoting Thompson v. State, 153 So.3d 84, 130 (Ala.Crim.App.2012).
However, in Thompson, this Court held: “ ‘Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986)(videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App.1984).’”
153 So.3d at 130, quoting Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989) (emphasis added). Although Lane did not contest the identity of the victim or the cause of death, his not-guilty plea required the State to prove those things beyond a reasonable doubt. Additionally, the photographs helped to illustrate the medical examiner’s testimony. Accordingly, the autopsy photographs were relevant and admissible. Therefore, there was no error, plain or otherwise, in the trial court’s decision to admit them.
X.
Next, Lane argues that the proof of theft offered at trial materially varied from the charge in the indictment. Specifically, Lane claims that, although the indictment charged him with stealing Wright’s vehicle, the State offered and relied on evidence that Lane also stole Wright’s wallet. Lane did not object to this alleged variance at trial; therefore, we will review this claim for plain error only.
*1127 Lane cites Hayes v. State, 65 So.3d 486, 491 (Ala.Crim.App.2010), for the proposition that “[p]roof of the theft of certain property that varies from the description of the stolen property identified in the indictment is a fatal variance.” According to Lane, he was “forced to defend against a new element of the crime — the theft of a wallet.” (Lane’s brief, at 87.) Additionally, Lane asserts that “the jury was not instructed to limit their deliberations to the offense charged — the theft of a vehicle — and the State’s reliance on the unexpected line of attack was prejudicial error.” (Lane’s brief, at 87.)
In Hayes, the defendant was indicted for stealing a purse. However, the State presented evidence indicating that the defendant stole a debit card and a cellular telephone; no evidence was presented indicating that the defendant stole a purse. The trial court, over Hayes’s objection, recharged the jury and amended the indictment so as to charge Hayes with stealing a “‘cell phone and a debit card’” rather than a “ ‘purse and its contents.’ ” Hayes, 65 So.3d at 488. This Court held that it was reversible error for the trial court to amend the indictment, over the defendant’s objection, to change the identity of the items alleged to have been stolen.
The present case is distinguishable. Here, the State presented ample evidence indicating that Lane stole Wright’s vehicle as charged in the indictment. However, the State also presented circumstantial evidence indicating that Lane stole Wright’s wallet in addition to stealing the vehicle. Testimony at trial indicated that Wright’s wallet was found inside the vehicle despite the fact that, according to Wright’s widow, Wright always kept his wallet in his back pocket. Although the evidence offered at trial went beyond what was contained in the indictment, the indictment was not amended as it was in Hayes. Accordingly, Lane’s claim is meritless and the trial court committed no error, plain or otherwise, in admitting the evidence regarding Wright’s wallet.
XI.
Lane next asserts that the trial court refused to remove a biased venire-member for cause and, consequently, that he was required to use a peremptory challenge to remove that veniremember. According to Lane, he could have used that peremptory challenge to remove another potential juror who had expressed confusion and a potential bias during voir dire.
Lane claims that the trial court should have granted his challenge for cause against juror number 256. Juror number 256 indicated that she worked as a police dispatcher; that she knew the trial judge as well as some of the police officers who would testify at trial; and that, although the shooting did not occur during her shift, she possibly remembered hearing about the shooting. During individual voir dire, juror number 256 was asked whether knowing the police officers would affect her partiality as a juror, to which juror number 256 replied: “I believe I could be biased. I’m not a hundred percent sure, but I might could be biased knowing the officers.” (R. 185.) When asked if she would give the prosecution the benefit of the doubt, juror number 256 replied: “I probably would.” (R. 186-87.)
Lane then made a motion to strike juror number 256 for cause based on “her candor that she would have a hard time not being biased because she knows the police officers.” (R. 187.) The trial court denied the challenge based on the fact that juror number 256 was not absolutely certain that she would be biased. The trial court stated: “You got to nail her down.... ” (R. 188.) Lane eventually used a peremptory strike to remove juror number 256
*1128 On appeal, Lane argues that the trial court’s failure to remove juror number 256 for cause was reversible error because, he says, “the jury that was eventually seated included a ‘juror[ ] who would likely have been the subject of peremptory challenges had such challenges been available.’ ” (Lane’s brief, at 89), quoting Ex parte Colby, 41 So.3d 1, 4-5 (Ala.2009). According to Lane, he likely would have used that peremptory strike to remove juror number 125. During group voir dire, juror number 125 stated that he remembered reading about the shooting in the newspaper a few years earlier and expressed some confusion over statements that Lane’s counsel made regarding the State’s burden of proof.
This Court has held:
“‘“‘A trial judge’s finding on whether or not a particular juror is biased “is based upon determinations of demeanor and credibility that are peculiarly within a trial judge’s province.” [Wainwright v.] Witt, 469 U.S. [412] 429, 105 S.Ct. [844,] 855 [(1985)]. That finding must be accorded proper deference on appeal. Id. “A trial court’s rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.” Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981).’”’”
Albarran v. State, 96 So.3d 131, 158-59 (Ala.Crim.App.2011) (quoting Dallas v. State, 711 So.2d 1101, 1107 (Ala.Crim.App.1997), quoting in turn Martin v. State, 548 So.2d 488, 490-91 (Ala.Crim.App.1988)). Additionally,
“[m]uch is left to the discretion of the trial court in determining whether a potential juror is biased or impartial, because the trial court is able to view the juror’s demeanor and hear the tenor of his or her responses during voir dire examination.
“‘“To justify a challenge of a juror for cause there must be a statutory ground (Ala.Code Section 12-16-150 (1975)), or some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.” Nettles v. State, 435 So.2d 146, 149 (Ala.Crim.App.), aff’d, 435 So.2d 151 (Ala.1983).... Ultimately, the test to be applied is whether the veniremember can set aside his or her opinions, prejudices, or biases, and try the case fairly and impartially, according to the law and the evidence. Smith v. State, [[Ms. CR-97-1258, December 22, 2000] — So.3d - (Ala.Crim.App.2000), aff’d in part and rev’d in part, [Ms. 1010267, March 14, 2003] — So.3d - (Ala.2003).]. This determination of a veniremember’s absolute bias or favor is based on the veniremember’s answers and demeanor and is within the discretion of the trial court; however, that discretion is not unlimited. Rule 18.4(e), Ala. R.Crim. P., provides, in part: “When a prospective juror is subject to challenge for cause or it reasonably appears that the prospective juror cannot or will not render a fair and impartial verdict, the court, on its own initiative or on motion of any party, shall excuse that juror from service in the case.” Even proof that a veniremember has a bias or fixed opinion is insufficient to support a challenge for cause. A prospective juror should not be disqualified for prejudice or bias if it appears from his or her answers and demean- or that the influence of that prejudice or bias can be eliminated and that, if chosen as a juror, the veniremember would render a verdict according to the law and the evidence. Mann v. *1129 State, 581 So.2d 22, 25 (Ala.Crim.App.1991); Minshew v. State, 542 So.2d 307 (Ala.Crim.App.1988).’
“McGowan v. State, 990 So.2d [931,] 951 [(Ala.Crim.App.2003)].”
Revis v. State, 101 So.3d 247, 305 (Ala.Crim.App.2011)(emphasis added).
In the present ease, juror number 256 did not indicate that she was absolutely biased by the fact that she knew some of the State’s witnesses. Juror number 256 indicated that she “believe[d]” she could be biased but was “not a hundred percent sure.... ” (R. 185.) Additionally, when asked if she would “[m]aybe give [the police] the benefit of the doubt,” juror number 256 replied that she “probably would.” (R. 186~87)(emphasis added). Thus, juror number 256 did not indicate that she had “a fixed opinion as to the guilt or innocence of the defendant which would bias [her] verdict.” § 12-16-150(7), Ala.Code 1975 (providing statutory grounds to remove a potential juror for cause). Additionally, her responses did not “import absolute bias or favor” leaving “nothing to the discretion of the trial court.” Revis, 101 So.3d at 305. Therefore, the trial court did not abuse its discretion by denying Lane’s challenge for cause as to juror number 256.
Moreover, even if the trial court erred by refusing to grant Lane’s for-cause challenge as to juror number 256, Lane was still left with an impartial jury. Thus, any error would have been harmless. See Rule 45, Ala. R.App. P. In Revis, supra, this court held:
“ ‘Because a defendant has no right to a perfect jury or a jury of his or her choice, but rather only to an “impartial” jury, see Ala. Const.1901 § 6, we find the harmless-error analysis to be the proper method of assuring the recognition of that right.’ Bethea v. Springhill Mem’l Hosp., 833 So.2d 1, 7 (Ala.2002). Even if Revis could show that Juror S.D. should have been removed for cause, he would need to show that he was prejudiced by being left with ‘a less-than-impartial jury.’ Id.”
101 So.3d at 304.
Lane claims that juror number 125’s presence on the jury rendered the jury impartial based on juror number 125’s responses during voir dire.[17] However, a review of the record reveals that juror number 125 was an impartial juror. During group voir dire, juror number 125 indicated that he remembered reading about the case in the newspaper. However, juror number 125 stated that he did not remember anything specific about the case and indicated that he would be able to put aside what he had read in the newspaper and “decide the case based solely upon the evidence of the case, and apply the law to that evidence and render a fair decision based upon that evidence alone.” (R. 203.)
Juror number 125 also expressed confusion regarding defense counsel’s statement during group voir dire in which defense counsel stated: “[W]e’re going to start out right here and right now by telling you that Anthony Lane killed Frank Wright. Let’s just go ahead and put that on the table.” (R. 119.) During individual voir dire, juror number 125 stated:
“The last question you asked, it referenced, you know, based on the Defendant being here today, just by his presence, do you feel as though he’s done anything wrong?
“And I didn’t completely get that, based on your original comment that *1130 said, you know, he’s — he did kill, you know, the victim.
“So I was a little confused by that.”
(R. 204-05.)
However, defense counsel further explained the State’s burden of proof and asked if the explanation was acceptable and whether juror number 125 would be able to render a fair decision based upon the evidence. Juror number 125 replied, “Sure.” (R. 206.) Accordingly, juror number 125’s responses did not indicate any biases or handicaps that would have prevented him from being an impartial juror. Lane has not shown that juror number 125’s presence on the jury “probably injuriously affected [Lane’s] substantial rights.” Rule 45, Ala. R.App. P. Thus, even if the court did err by not excusing juror number 256 for cause, that error was harmless.
XII.
Next, Lane argues that the trial court violated his constitutional right to an impartial jury by death-qualifying the jurors, i.e., by allowing the jurors to be questioned regarding their opinions on the death penalty. According to Lane, death-qualifying the potential jurors created a jury that was more prone to convict, more receptive to aggravating circumstances, and less likely to consider nonstatutory mitigating circumstances. Additionally, Lane asserted that the State successfully challenged two black jurors for cause based on their opinions concerning the death penalty. According to Lane, the death-qualification process produces juries that are less diverse by disproportionately excluding minorities and women. Lane did not object to the trial court’s decision to death-qualify the jury; therefore, this issue will be reviewed for plain error only. See Rule 45A, Ala. R.App. P.
The Supreme Court of the United States has upheld the constitutionality of death-qualifying a jury. See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Furthermore, in Davis v. State, 718 So.2d 1148 (Ala.Crim.App.1995), this Court held:
“A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from death-qualifying jurors in capital cases. Id.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff’d, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).”
Davis, 718 So.2d at 1157 (footnote omitted). See also McCray, 88 So.3d at 76; Vanpelt, 74 So.3d at 50.
The practice of death-qualifying juries has been repeatedly held to be constitutional. Therefore, this Court finds no error, much less plain error, in the trial court’s decision to allow the prospective jurors to be questioned concerning their views on capital punishment. Accordingly, this issue does not entitle Lane to any relief.
XIII.
Lane next argues that the trial court improperly instructed the jury on reasonable doubt. According to Lane, the trial court’s instruction “created different levels of reasonable doubt, violating [Lane’s] rights to due process, a fair trial, *1131 and an impartial jury....” (Lane’s brief, at 92.) Lane failed to object to the trial court’s instructions at trial. Therefore, we will review this claim for plain error only. See Rule 45A, Ala. R.App. P.
Lane claims that the following instruction was improper: “[Reasonable doubt] means a doubt that you can give a good, sound, sensible reason for.” (R. 691.) Further, Lane claims that the trial court erred by telling the jury that, if there remained an “abiding conviction” of guilt, then the jury had been convinced beyond a reasonable doubt. (R. 691.)
This Court has held:
‘““In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that ‘an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.’ Williams v. State, 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff’d, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).”’
“Broadnax v. State, 825 So.2d 134, 196 (Ala.Crim.App.2000), quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim.App.1998). Moreover, ‘[w]hen reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999).’ Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000).”
Snyder v. State, 893 So.2d 488, 548 (Ala.Crim.App.2003).
Lane also argues that the instructions on reasonable doubt violated Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). “In Cage v. Louisiana, the United States Supreme Court held that a court’s use of the three phrases ‘grave uncertainty,’ ‘actual substantial doubt,’ and ‘moral certainty’ to define reasonable doubt would cause a reasonable juror to believe that the State’s burden of proof was less than what is actually necessary to convict. Cage, 498 U.S. at 41, 111 S.Ct. 328.” Harris v. State, 2 So.3d 880, 913 (Ala.Crim.App.2007).
This Court has reviewed the jury instructions in the present case as a whole and determined that the trial court’s instructions on reasonable doubt were thorough and accurate. Additionally, the instructions did not violate Cage. See Harris, 2 So.3d at 913-14 (“[T]his court has upheld instructions informing the jury that if it had an ‘abiding conviction of the truth of the charge then it was convinced beyond a reasonable doubt,’ determining that such language did not violate Cage.”).
We also note that, in Morris v. State, 60 So.3d 326, 373 (Ala.Crim.App.2010), this Court found no plain error in the following, similar jury instruction: “[A]nd the law means a sound and sensible reason as opposed to some imaginary or fanciful reason .... ” Similarly, in Harris, supra, this Court found no error, plain or otherwise, in the trial court’s use of the phrase, “abiding conviction of guilt.” 2 So.3d at 913-14. Accordingly, we find no error, plain or otherwise, in the trial court’s jury instructions regarding reasonable doubt.
XIV.
Lane next argues that the trial court violated his rights to due process and an impartial jury by counting robbery at both the guilt phase and the penalty phase of the trial. Lane contends that, because the jury had already determined that Lane *1132 committed a robbery at the guilt phase of his trial, the aggravating circumstance of robbery was already firmly established in the jurors’ minds. Therefore, he says, the relative weight given to that aggravating circumstance during the penalty phase was unfairly strengthened, resulting in an unfair trial and a denial of due process. Lane also argues that robbery does not “meaningfully narrow the class of individuals sentenced to death because robbery is so pervasive.” (Lane’s brief, at 94.) Lane did not raise this issue at trial; therefore, we will review it for plain error only. See Rule 45A, Ala. R.App. P.
This Court addressed the issue of “double-counting” in Morris v. State, supra:
“Morris’s claim concerning the ‘double-counting’ of the aggravating circumstance has consistently been upheld by Alabama appellate courts:
“ ‘ “ ‘[WJhen a defendant is found guilty of a capital offense, “any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.” Ala.Code 1975, § 13A-5-45(e); see also Ala.Code 1975, § 13A-5-50 (“The fact that a particular capital offense as defined in Section 13A-5^10(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5^19 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.”). This is known as “double-counting” or “overlap,” and Alabama courts “have repeatedly upheld death sentences where the only aggravating circumstance supporting the death sentence overlaps with an element of the capital offense.” Ex parte Trawick, 698 So.2d 162, 178 (Ala.1997); see also Coral v. State, 628 So.2d 954, 965 (Ala.Crim.App.1992).’”
“Billups v. State, 86 So.3d 1032, 1054 (Ala.Crim.App.2009), quoting Barber v. State, 952 So.2d 393, 458-59 (Ala.Crim.App.2005). See also Newton v. State, 78 So.3d 458, 470 (Ala.Crim.App.2009).
“This precise ground of error, that this double-counting fails to narrow the class of death-eligible murderers, has been addressed and determined adversely to Morris by the United States Supreme Court:
“ ‘Here, the “narrowing function” was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that “the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.” The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more.’
“Lowenfield v. Phelps, 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).
“Thus, as this issue has previously been discussed and determined adversely to Morris’s contention, there is no error on this ground.”
60 So.3d at 380-81. Thus, under Morris, there was no error, plain or otherwise, in double counting robbery at Lane’s trial. *1133 Accordingly, Lane is due no relief on this claim.
XV.
Next, Lane argues that his death sentence was imposed in violation of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and, thus, is unconstitutional. In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court-held that the Constitution requires that any fact that increases the penalty for a crime above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. In Ring, the Court extended its holding in Apprendi to death-penalty eases.
Lane contends that, in addition to determining whether aggravating circumstances exist, determining whether those aggravating circumstances outweigh any mitigating circumstances is a factual determination that exposes a defendant to a greater punishment than is authorized by the jury’s verdict alone. Therefore, he argues, both determinations must be made by a unanimous jury beyond a reasonable doubt.
Lane acknowledges that this argument was rejected by the Alabama Supreme Court in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002). In Waldrop, discussing whether Ring requires that the jury, not the trial court, determine whether the aggravating circumstances outweigh the mitigating circumstances, the Supreme Court explained:
“[T]he weighing process is not a factual determination. In fact, the relative ‘weight’ of aggravating circumstances and mitigating circumstances is not susceptible to any quantum of proof. As the United States Court of Appeals for the Eleventh Circuit noted, ‘While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard ... the relative weight is not.’ Ford v. Strickland, 696 F.2d 804, 818 (11th Cir.1983). This is because weighing the aggravating circumstances and the mitigating circumstances is a process in which ‘the sen-tencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.’ Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). Moreover, the Supreme Court has held that the sentencer in a capital case need not even be instructed as to how to weigh particular facts when making a sentencing decision. See Harris v. Alabama, 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995)(rejecting ‘the notion that “a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required”’ (quoting Franklin v. Lynaugh, 487 U.S. 164, 179, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)) and holding that ‘the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer’).
“Thus, the weighing process is not a factual determination or an element of an offense; instead, it is a moral or legal judgment that takes into account a theoretically limitless set of facts and that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum....
“In Ford v. Strickland, supra, the defendant claimed that ‘the crime of capital murder in Florida includes the element of mitigating circumstances not outweighing aggravating circumstances and that the capital sentencing proceeding in Florida involves new findings of fact significantly affecting punishment.’ *1134 Ford, 696 F.2d at 817. The United States Court of Appeals for the Eleventh Circuit rejected this argument, holding that ‘aggravating and mitigating circumstances are not facts or elements of the crime. Rather, they channel and restrict the sentencer’s discretion in a structured way after guilt has been fixed.’ 696 F.2d at 818. Furthermore, in addressing the defendant’s claim that the State must prove beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances, the court stated that the defendant’s argument
“ ‘seriously confuses proof of facts and the weighing of facts in sentencing. While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, see State v. Dixon, 283 So.2d 1, 9 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. [1950], 40 L.Ed.2d 295 (1974), and State v. Johnson, 298 N.C. 47, 257 S.E.2d 597, 617-18 (1979), the relative weight is not. The process of weighing circumstances is a matter for judge and jury, and, unlike facts, is not susceptible to proof by either party.’
“696 F.2d at 818. Alabama courts have adopted the Eleventh Circuit’s rationale. See Lawhorn v. State, 581 So.2d 1159, 1171 (Ala.Crim.App.1990) (‘while the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party’); see also Melson v. State, 775 So.2d 857, 900-901 (Ala.Crim.App.1999); Morrison v. State, 500 So.2d 36, 45 (Ala.Crim.App.1985).
“Thus, the determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently, Ring and Apprendi do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.”
Waldrop, 859 So.2d at 1189-90.
Lane also argues that the holding in Waldrop is unconstitutional because, he says, it “arbitrarily renders defendants convicted of certain capital offenses ... automatically subject to the death penalty at the end of the guilt phase, while defendants convicted of other capital offenses cannot be sentenced to death without further jury fact-findings at the penalty phase.... ” (Lane’s brief, at 96.) Essentially, Lane is arguing that, although the jury, during its guilt-phase deliberations, found that Lane committed the murder during the course of a robbery beyond a reasonable doubt, it must repeat that exact process during its penalty-phase deliberations. However, in Waldrop, the Alabama Supreme Court held:
“[Wjhen a defendant is found guilty of a capital offense, ‘any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.’ Ala.Code 1975, § 13A-5-45(e); see also Ala.Code 1975, § 13A-5-50 (‘The fact that a particular capital qoffense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.’). This is known as ‘double-counting’ or ‘overlap,’ and Alabama courts ‘have repeatedly upheld death sentences where the only aggravating circum *1135 stance supporting the death sentence overlaps with an element of the capital offense.’ Ex parte Trawick, 698 So.2d 162, 178 (Ala.1997); see also Coral v. State, 628 So.2d 954, 965 (Ala.Crim.App.1992).2
“Because the jury convicted Waldrop of two counts of murder during a robbery in the first degree, a violation of Ala.Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala.Code 1975, § 13A-5-49(4), was ‘proven beyond a reasonable doubt.’ Ala.Code 1975, § 13A-5-45(e); Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A — 5—45(f). Thus, in Wal-drop’s case, the jury, and not the trial judge, determined the existence of the ‘aggravating circumstance necessary for imposition of the death penalty.’ Ring, 536 U.S. at 609, 122 S.Ct. at 2443. Therefore, the findings reflected in the jury’s verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi require.
“2 The United States Supreme Court upheld a similar procedure in Lowenfield v. Phelps, 484 U.S. 231, 244-45, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988)(‘The use of “aggravating circumstances” is ... a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury’s discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.’). See also Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (‘The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both).’).”
Waldrop, 859 So.2d at 1188.
Although Lane disagrees with the holding in Waldrop, “[t]his Court has no authority to overrule Alabama Supreme Court precedent.” Whatley v. State, 146 So.3d 437, 489 (Ala.Crim.App.2011) (opinion on return to remand) (citing § 12-3-16, Ala.Code 1975).
Therefore, based on the Alabama Supreme Court’s decision in Waldrop, we find no merit in Lane’s contention that his sentence was imposed in violation of Ring. Furthermore, because Lane was convicted of murdering Wright during a robbery in the first degree, the jury’s verdict at the guilt phase established the existence of an aggravating circumstance, see § 13A-5-49(4), Ala.Code 1975, thereby making Lane eligible for the death penalty. Under Waldrop, Lane’s sentence does not violate Ring; thus, contrary to Lane’s contention, his sentence is not unconstitutional, and he is entitled to no relief on this claim.
XVI.
Lane next asserts that the trial court failed to instruct the jury that if it determined that the aggravating circumstances and the mitigating circumstances were of equal weight, then it should recommend a sentence of life without parole. Therefore, he says, the trial court’s penalty-phase instructions regarding the weighing of aggravating and mitigating circumstances violated State and federal law. Lane did not object to the trial court’s jury instructions at trial. Accordingly, we will review this claim for plain error only. See Rule 45A, Ala. R.App. P.
In support of his argument, Lane cites Ex parte Bryant, 951 So.2d 724, 730 (Ala.2002), in which the Alabama Supreme Court found plain error in the trial court’s *1136 jury instructions because “the jury instructions erroneously allow[ed] the conclusion that the death penalty is appropriate even if the aggravating circumstances do not outweigh the mitigating circumstances so long as the mitigating circumstances do not outweigh the aggravating circumstances.”
However, Bryant noted other cases in which trial courts failed to specifically instruct the jury that it must recommend life without parole if the mitigating circumstances and the aggravating circumstances are equally balanced. See Ex parte Trawick, 698 So.2d 162 (Ala.1997); Ex parte Cothren, 705 So.2d 861, 870-71 (Ala.1997); and Ex parte Melson, 775 So.2d 904 (Ala.2000). In those cases, the omission did not rise to the level of plain error because the jury instructions also provided or implied that, in order to recommend a sentence of death, the aggravating circumstances must outweigh the mitigating circumstances.
The Alabama Supreme Court found plain error in Bryant because the trial court “did not add the caveat which sufficed in Trawick, supra, that the jury was to ‘recommend the death penalty only if [the jury] found that the aggravating circumstances outweighed the mitigating circumstances.’” 951 So.2d at 730, quoting Trawick, 698 So.2d at 173. The Court in Bryant also noted that
“[n]o other instructions by the trial court and no other feature of the record instills us with any confidence that the jury did not, within the parameters of the erroneous instructions, base the death penalty recommendation on a finding that the mitigating circumstances did not outweigh the aggravating circumstances even though the mitigating circumstances did equal the aggravating circumstances.”
951 So.2d at 730.
This Court has also reiterated that omitting such an instruction is not plain error
so long as the jury was instructed that it could recommend the death penalty only if it found that the aggravating circumstances outweighed the mitigating circumstances. Albarran v. State, 96 So.3d at 209-10. Further, this Court has specifically held that “the circuit court’s failure to instruct the jury regarding what to do if the mitigating circumstances and aggravating circumstances were equal d[oes] not amount to plain error.” Id. at 210.
In the present case, the trial court specifically instructed the jury that it could recommend a death sentence only if the aggravating circumstances outweighed the mitigating circumstances. The trial curt stated:
“The law also provides that which of those two punishments should be imposed upon the Defendant depends on whether any aggravating circumstances outweighs the mitigating circumstances..
[[Image here]]
“In reaching a decision concerning what the punishment should be you must determine whether any aggravating circumstance exist. If so, you must determine whether any mitigating circumstance exist.
[[Image here]]
“And this is what I just mentioned a minute ago. If the jury is not convinced beyond a reasonable doubt, based upon the evidence, that one or more of such aggravating circumstances exist. Then, the jury must find that the Defendant’s punishment should be life imprisonment without parole. Regardless of whether there are any mitigating circumstances in this case.”
(R. 924-27.) The trial court then defined the possible aggravating and mitigating circumstances that the jury might find and consider. The court stated:
*1137 “Now, ladies and gentlemen, if after a full and fair consideration of all the evidence in this case, you are convinced beyond a reasonable doubt and to a moral certainty that at least one aggravating circumstance does exist. And you are convinced that the aggravating circumstance outweighs the mitigating circumstances. Your verdict would be: ‘We, the jury, find the Defendant be punished by death.... ’
[[Image here]]
“If, on the other hand, you find that the mitigating circumstances outweigh the aggravating circumstances. Your verdict would be: ‘We, the jury, find that the Defendant be punished by life imprisonment without parole.’ ”
(R. 941-42.) Thus, the trial court adequately informed the jury that it could recommend a death sentence only if it found that the aggravating circumstances outweighed the mitigating circumstances. Pursuant to Albarran, supra, and Bryant, supra, the trial court’s jury instructions did not amount to plain error.
XVII.
Finally, Lane contends that evolving standards of decency have rendered Alabama’s method of execution — lethal injection — unconstitutional. Lane asserts that “Alabama’s unreported and underdeveloped procedures for administering lethal injection pose a substantial risk of inflicting unnecessary pain and therefore violate evolving standards of decency.” (Lane’s brief, at 99.)
This Court has stated:
“Effective July 1, 2002, Alabama’s primary method of execution is lethal injection involving a three-drug protocol. Section 15-18-82.1(a), Ala.Code 1975. Section 15-18-82.1(c), Ala.Code 1975, provides: ‘A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution.’ Section 15 — 18—82.1(h), Ala.Code 1975, also provides: ‘In any case in which an execution method is declared unconstitutional the death sentence shall remain in force until the sentence can be lawfully executed by any valid method of execution.’
“The constitutionality of Alabama’s method of execution has been addressed by the United States Supreme Court and the Alabama Supreme Court. In Ex parte Belisle, 11 So.3d 323 (Ala.2008), the Alabama Supreme Court stated:
“ ‘The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze [v. Rees, 553 U.S. 35, 62,] 128 S.Ct. [1520,] 1538 [(2008)], and noted that “[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.” Baze, [553 U.S. at 61], 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that “Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.” Baze, [553 U.S. at 114], 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana “provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.” Baze, [553 U.S. at 121], 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“ ‘The State argues, and we agree, that Belisle, like the inmates in Baze, *1138 cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. “Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of ‘objectively intolerable risk of harm’ that qualifies as cruel and unusual.” Baze, [553 U.S. at 50], 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.’
“11 So.3d at 339.”
Thompson v. State, 153 So.3d 84, 180-81 (Ala.Crim.App.2012) (footnote omitted).
Therefore, Alabama’s method of execution is not unconstitutional, and Lane is not entitled to any relief on this claim.
XVIII.
Lane argues that the trial court’s sentencing order was deficient in several respects because, he argues, the order failed to comply with Alabama law. The State concedes that the order is deficient for two reasons and agrees that a remand is necessary to correct the errors.
A.
Lane raised certain arguments regarding the sentencing order which we find lack merit. We will address each in turn.
1.
Lane argues that the trial court “ignored significant mitigation evidence regarding Mr. Lane’s mental and intellectual deficits.” (Lane’s brief, at 74.) According to Lane, he presented evidence diming the penalty phase that he was mentally retarded; that he had a low I.Q.; that he was functionally illiterate; that he had medical problems at birth; and that his mother had been murdered. Lane contends that the trial court failed to fully consider this evidence. Lane asserts that the sentencing order “does not refer to [his] adaptive deficits, his medical problems, or his mother’s death.” (Lane’s brief, at 75.)
In Revis v. State, 101 So.3d 247 (Ala.Crim.App.2011), the appellant raised a similar argument. This Court noted:
“[A]lthough the trial court did not make specific findings as to these nonstatutory mitigating circumstances in his sentencing order, it did state that ‘[i]n addition to the mitigating circumstances specified in Section 13A-5-51[, Ala.Code 1975,] the court is to consider any other relevant mitigating circumstances or any aspect of the defendant’s character or record and any circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.’ ”
101 So.3d at 323. In Revis, this Court also noted that the trial court had properly instructed the jury regarding both statutory and nonstatutory mitigating evidence. Additionally, we noted:
“In Morris v. State, 60 So.3d 326, 348 (Ala.Crim.App.2010), this court found no plain error in the trial court’s failure to make specific findings concerning any nonstatutory mitigating circumstances in the case and stated:
“‘In Johnson v. State, 120 So.3d 1130 (Ala.Crim.App.2009), this Court determined that the trial court’s failure to make specific findings as to each non-statutory mitigating circumstance in its sentencing order did not constitute plain error. Moreover, as in the present case, the sentencing order addressed all that was required, although it did not list or find any non-statutory mitigating circumstances.’ ”
*1139 Revis, 101 So.3d at 324. In Monis v. State, 60 So.3d 326, 348 (Ala.Crim.App.2010) (quoting Ex parte Lewis, 24 So.3d 540, 545 (Ala.2009), quoting in turn Clark v. State, 896 So.2d 584, 653 (Ala.Crim.App.2000)), this Court held:
“ ‘ “ ‘Although the trial court did not list and make findings as to the existence or nonexistence of each nonstatutory mitigating circumstance offered by Clark, as noted above, such a listing is not required, and the trial court’s not making such findings indicates only that the trial court found the offered evidence not to be mitigating, not that the trial court did not consider this evidence. Clearly, the trial court considered Clark’s proffered evidence of mitigation but concluded that the evidence did not rise to the level of a mitigating circumstance.’ ” ’ ”
Furthermore, in Ex parte Jackson, 836 So.2d 979, 987-88 (Ala.2002), quoting Ex parte Clisby, 456 So.2d 105, 108-09 (Ala.1984), the Alabama Supreme Court held that “‘the sentencing authority in Alabama, the trial judge, has unlimited discretion to consider any perceived mitigating circumstances, and he can assign appropriate weight to particular mitigating circumstances.’ ”
A review of the sentencing order in the present case reveals that the trial court did refer to and consider nonstatutory mitigating circumstances. In its discussion of the statutory mitigating circumstances, the trial court stated that it did not find that Lane’s capacity “to appreciate the criminality of his conduct, or to conform his conduct to the requirements of law was substantially impaired.” (C. 26.) However, the trial court then stated: “Although the Court does note that there was testimony concerning the Defendant having an IQ of 70 and whether or not he was mentally retarded.” (C. 26.) Thus, the record reveals that the trial court did consider evidence' of nonstatutory mitigating circumstances.
We also note that the trial court properly instructed the jury regarding both statutory and nonstatutory mitigating circumstances. Trial courts are presumed to follow their own instructions. Ex parte Loggins, 771 So.2d 1093, 1108 (Ala.2000). The fact that the trial court did not list the evidence regarding Lane’s medical issues at birth, his adaptive deficits, and his mother’s death does not mean that it failed to consider it. In fact, the sentencing order states the following: “I first start out with the presumption that the proper sentence should be life without parole by looking at any mitigating circumstances which would support a sentence of life without parole.” (C. 25.) Thus, the record reflects that the trial court considered all the evidence presented during the penalty phase in reaching its determination. Accordingly, Lane’s argument is without merit.
2.
Lane next asserts that the trial court improperly considered lack of remorse as an aggravating circumstance. However, the record refutes this contention. In its sentencing order, the trial court stated:
“[I]t appears that there were two aggravating circumstances that were proven beyond a reasonable doubt. The two of them are found in subsection 4 where the capital offense was committed while the defendant was engaged in the commission of a robbery, etc. and in subsection 6 where the offense was committed for pecuniary gain.
“It is clear to this court that the aggravating circumstances clearly outweigh the mitigating circumstance that was proven in this case.”
*1140 (C. 26.) Thus, the record reflects that the trial court found only two aggravating circumstances that it weighed against the mitigating circumstances. Although the trial court did discuss Lane’s perceived lack of remorse, those comments were in a separate section of the sentencing order in which the trial court was recounting the evidence and making general comments about the case.
Lane also argues that the trial court “improperly found the heinous, atrocious, or cruel aggravating circumstance without factual support.” (Lane’s brief, at 77.) Again, the record does not support that contention because the trial court clearly stated that it found only two aggravating circumstances that it weighed against the mitigating circumstances. Like the trial court’s comments regarding Lane’s perceived lack of remorse, the comments regarding the nature of the crime were merely a commentary on the evidence.
In Burgess v. State, 827 So.2d 134 (Ala.Crim.App.1998), the appellant raised a similar argument. This Court held:
“[T]he trial court’s commentary on the premeditated nature of the offense was merely that: a commentary on the facts of the case. The court’s commentary on the ‘inherently disturbing’ nature of an ‘individual who is willing to kill in order to acquire the property of another’ was the trial court’s basis for attributing a greater weight to the aggravating circumstance listed in § 13A-5-49(4) as compared to the mitigating circumstances. His comments on Burgess’s remorse and his sanity were merely discussions, of nonstatutory mitigating circumstances. It would take a strained interpretation of the trial court’s weighing of the aggravating and mitigating circumstances to conclude that the court improperly considered any nonstatutory aggravating circumstances.”
Id. at 182.
The sentencing order in the present case, when read in its entirety, does not support Lane’s contention that the trial court found or considered any aggravating circumstances other than the two it specifically mentioned. Although the trial court did say that it “believefd] that the manner in which this murder was carried out to have been done so in a heinous, atrocious and cruel manner,” the court also made clear that it “did not consider the way the crime was committed to be an aggravating circumstance.” (C. 27.) Accordingly, Lane is due no relief on this claim.
B.
Lane argues, and the State agrees, that the sentencing order was deficient because the trial court found and considered the aggravating circumstance of murder for pecuniary gain, see § 13A-5-49(6), Ala.Code 1975, despite the fact that Lane was convicted of murder made capital because it was committed during a robbery. In Hodges v. State, 856 So.2d 875, 891 (Ala.Crim.App.2001) (footnote omitted), this Court held:
“The Alabama Supreme Court has held that when a trial court evaluates the aggravating circumstances applicable to a defendant convicted of robbery-murder, a court may not consider the fact that money was taken from the victim as constituting the aggravating circumstance that the murder was committed for pecuniary gain. Our Supreme Court in Cook v. State, 369 So.2d 1251, 1256 (Ala.1978), opinion on remand, 369 So.2d 1260 (Ala.Crim.App.1979), after remand, 384 So.2d 1158 (Ala.Crim.App.), cert. denied, 384 So.2d 1161 (Ala.1980), stated:
“‘At Cook’s sentencing hearing the trial judge found that two aggrava *1141 ting circumstances were present: (4) — a capital felony committed in the course of a robbery, and (6) — a capital felony committed for pecuniary gain. In so finding we feel that the learned trial judge misconstrued the latter aggravating circumstance, in effect condemning Cook twice for the same culpable act — stealing money. Subsection 6 would, of course, cover a variety of crimes committed with the hope- of financial benefit, ranging from “murder-for-hire” to an heir killing his benefactor to gain his inheritance. But we do not think it' appropriate to apply this aggravating circumstance to situations already condemned under subsection 4 which by definition involve an attempt at pecuniary gain. Thus, to avoid repetition, subsection 6 should not be applied to a robbery. The trial court erred in considering it and including it in the findings of fact.’
“This Court has remanded cases when the trial court applied the aggravating circumstance of murder for pecuniary gain to a robbery-murder. See Bufford v. State, 382 So.2d 1162 (Ala.Crim.App.1980), writ denied, 382 So.2d 1175 (Ala.1980); Lewis v. State, 380 So.2d 970 (Ala.Crim.App.1979)....
“The aggravating circumstance that the murder was committed for pecuniary gain was erroneously applied in this case. For this. reason the trial court must omit this aggravating circumstance from its consideration and then reweigh the aggravating circumstances and the mitigating circumstances. See § 13A-5-47(e), Ala.Code 1975.”
In the present case, the trial court’s sentencing order stated:
“[I]t appears that there were two aggravating circumstances that were proven beyond a reasonable doubt. The two of them are found in subsection 4 where the capital offense was committed while the defendant was engaged in the commission of a robbery, etc. and in subsection 6 where the offense was committed for pecuniary gain.”
(C. 26.) Under Hodges, supra, this was error.
Lane also argues that the trial court improperly negated the mitigating, circumstance that Lane had no' significant history of prior criminal activity, see § 13A-5-51(1), Ala.Code 1975, by considering Lane’s juvenile record. The State concedes that this was error as well.
In Ex parte Burgess, 811 So.2d 617, 624 (Ala.2000), the Alabama Supreme Court held that “Alabama law explicitly precludes a trial court from using juvenile adjudications to negate the mitigating circumstance of no significant history of prior criminal activity.” The Court noted that,
“under the Alabama capital-sentencing scheme, juvenile adjudications are not convictions and cannot be considered as prior criminal activity. Freeman v. State, 555 So.2d 196, 212 (Ala.Crim.App.1988), aff’d, 555 So.2d 215 (Ala.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990). Only convictions can negate the statutory mitigating circumstance of no significant history of prior criminal activity. § 13A-5-51(1), Ala.Code 1975; Freeman v. State, 651 So.2d 576, 597-98 (Ala.Crim.App.1994).”
Burgess, 811 So.2d at 623. However, the Alabama Supreme Court also agreed with this Court’s conclusion “that a trial court may consider a defendant’s juvenile adjudications to be a relevant consideration in deciding what weight to assign to the statutory mitigating circumstances of a defendant’s lack of a significant prior criminal history and a defendant’s age at the time of the offense.” Id. at 624.
*1142 In the present case, the presentence report contained in the record indicated that Lane had a significant history of juvenile arrests and convictions. (C. 74-75.) In its sentencing order, the trial court stated: “So there does appear to me to be a significant history of criminal activity, albeit in juvenile court.” (C. 25.) The trial court went on to note that the only statutory mitigating circumstance that it found and considered was the defendant’s age at the time he committed the crime. See § 13A-5-51(7), Ala.Code 1975. Thus, it appears that the trial court used Lane’s juvenile record to entirely negate the mitigating circumstance enumerated in § 13A-5-51(1), Ala.Code 1975, i.e., that the defendant had no significant history of criminal activity. Under Burgess, supra, it was error to use Lane’s juvenile record to completely negate the no-significant-criminal-history mitigating circumstance.
However, as noted in Burgess, the trial court is not precluded from considering Lane’s juvenile record in assigning weight to that mitigating circumstance. Similarly, the trial court may consider Lane’s juvenile adjudications when assigning weight to the mitigating circumstance enumerated in § 13A-5-51(7), Ala.Code 1975, i.e., the defendant’s age at the time he committed the crime. Burgess, 811 So.2d at 624.
Because the trial court erred in finding, as an aggravating circumstance, that the murder was committed for pecuniary gain and because the trial court improperly negated the no-significant-criminal-history mitigating circumstance, it is necessary to remand this case to the trial court with instructions that it set aside the sentencing order and enter a new order in compliance with this opinion. The trial court shall take all necessary action to see that the circuit clerk makes due return to this Court at the earliest possible time and within 42 days after the release of this opinion.
AFFIRMED AS TO CONVICTION; REMANDED WITH INSTRUCTIONS AS TO SENTENCING.
WINDOM, P.J., and KELLUM and JOINER, JJ., concur. WELCH, J., dissents, with opinion.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. According to Dr. Goffs report, Lane was also evaluated by means of the following: "Reitan-Indiana Aphasia Screening Test, informal clock drawing tasks, the fourth edition of the Wide Range Achievement Test (WRAT-IV), the second edition of the Adaptive Behavior Assessment System (ABAS-II) with his grandmother serving as informant and the MacArthur Competency Assessment Tool for Criminal Adjudication (MacCat-Ca).” (C. 497.)

. The trial court ultimately found that Lane did not meet the second prong of Atkins and therefore did not make a formal finding as to whether any of Lane’s deficits manifested before he turned 18. We note that Lane was 19 years old when this crime was committed.

. Lane's notebook was admitted during the guilt phase of the trial and is discussed more fully in Section III of this opinion.

. We note that anger or anxiety is not synonymous with mental retardation.

. Ferguson v. State, dealt with an appeal from the denial of a Rule 32, Ala. R.Crim. P., petition for postconviction relief. However, this Court noted that the Atkins decision applied retroactively to cases on collateral review and addressed the appellant’s claim.

. "Rl” denotes the transcript from Lane’s initial arraignment held on September 30, 2009.

. "R2” denotes the transcript from the youthful-offender hearing held on November 23, 2009.

. In his brief, Lane refers to the content in the notebook as "the purported writings of Mr. Lane....” (Lane’s brief, at 29.) However, defense counsel never disputed that the notebook was written by Lane. Before trial, Lane filed a .motion in limine to exclude the notebook. In that motion, Lane stated that the notebook "was written in its entirety over two years prior to the alleged shooting by the defendant herein....” (C. 279.)

. The entire notebook was admitted into evidence.

. There are exceptions to Rule 404(a), see Rule 404(a)(1)—(3), Ala. R. Evid.; however, none are applicable in the present case.

. “MH” denotes the record from the motion hearing held on March 12, 2010.

. Initially there were 15 potential black jurors; however, one was struck for cause. Lane does not object to any of the State’s strikes for cause.

. Lane also raised a Batson challenge to the State's striking of juror number 436, a white female, which the trial court denied. Lane does not raise any arguments relating to that juror on appeal. Allegations that are not expressly argued on appeal are deemed to be abandoned and will not be reviewed by this Court. Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995).

. In McGahee, the venire consisted of 24 blacks. The State removed 8 of the blacks for cause and used 16 of its peremptory strikes to remove the rest.

. The underlying trial in Cochran actually occurred in 1982.

. Lane did not move to strike juror number 125 for cause nor does he argue on appeal that the trial court should have excused juror number 125.

. “R3” denotes the record on return to remand.